453 S.E.2d 661

**MICHAEL SCOTT M., Plaintiff Below, Appellant,**

v.

**VICTORIA L.M., Defendant Below, Appellee.**

No. 22335.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 1994.

Decided Dec. 16, 1994.

Michael T. Clifford, Clifford, Mann & Swisher, Charleston, for appellant.

Robert Miller, Legal Aid Soc. of Charleston, Charleston, for appellee.

PER CURIAM:

This is an appeal by Michael M.[1] (hereinafter "Appellant") from an order, dated October 18, 1993, of the Circuit Court of Kanawha County, setting aside the recommendation of the family law master which awarded him custody of the parties' five and a half-year-old son (hereinafter "Justin"). The Appellant contends that the lower court erred by failing to adopt the recommendation of the family law master and by awarding custody of the child to his ex-wife, Victoria M. (hereinafter "Appellee"). We reverse and remand for the entry of an order awarding custody of the parties' infant child to the Appellant.

I.

The parties were married on December 17, 1988. On July 18, 1991, they separated and the Appellant filed for divorce based upon irreconcilable differences the following February. Alimony was waived and the Appellant was granted temporary custody of Justin pending a final order regarding custody in the divorce proceeding.

There were four hearings before the family law master in this matter regarding the issue of custody. During these proceedings it came to light that the Appellant had previously been awarded custody of Justin during a proceeding before the Magistrate Court of Kanawha County in which the Appellee was charged with abandoning Justin.[2] At the commencement of the divorce proceeding, the family law master continued that award by temporary order.

Testimony was heard at three of the four hearings which took place in this matter. Michael Scott M., the Appellant, testified that he was Justin's primary caretaker, and that the child's paternal grandmother and great grandmother cared for the child while he was at work. At a hearing on January 14, 1992, Daniel M., the Appellee's father, testified on behalf of the Appellant. He gave evidence that the Appellant was the primary caretaker, and gave his opinion that Justin would be much better off with his father.[3] Daniel M. also stated that the Appellee routinely left Justin unattended or in the care of his father or his father's parents.

Danny M., Appellant's father, testified that his son was the primary caretaker. He also testified that his daughter-in-law was a filthy housekeeper, and frequently failed to show up for visitations. He maintained that the child was more attached to his father than his mother.

Sharon Renee M., the wife of Appellant's brother, gave much the same testimony. She also claimed that the Appellee spent many evenings in bars, and claimed she kept a rope on the child's bedroom door to confine him so she could sleep. However, these same witnesses also testified that the Appellant did leave Justin with his mother or grandmother during the day while he was at work.

The Appellant introduced documentary evidence in the form of his handwritten log demonstrating that the Appellee frequently failed to exercise her visitation rights with regard to Justin under the temporary order entered by the family law master. During the fourth hearing in this matter, the Appel-

---

1. We follow our past practice in juvenile and domestic relations cases which involve sensitive facts and do not use the last names of the parties. *See, e.g., In re Jonathan P.,* 182 W.Va. 302, 303, n. 1, 387 S.E.2d 537, 538, n. 1 (1989); *State ex rel. W.Va. Dep't of Human Serv. v. Cheryl M.,* 177 W.Va. 688, 689, n. 1, 356 S.E.2d 181, 182, n. 1 (1987).

2. Apparently, the Appellant had previously been awarded custody of Justin by the Magistrate Court of Kanawha County following domestic violence proceedings in which it was alleged that

the Appellee left Justin with a babysitter and did not return.

3. Specifically, Mr. M. stated that, "Well, I love my daughter I really do, but yet she stayed on the road quite a bit and was gone and Mike seemed to have to care for him every evening and every night and even on his days off. I've seen him sit there on a Thursday or Friday, Saturday and Sunday and take care of the kid, you know. Mike took care of him quite a bit, anytime he was home it seemed like Mike was taking care of him".

lee stated that she often failed to visit Justin because she could not get up her driveway when it rains. Part of the reason for this, she explained, is the fact that she has now remarried, has another child and has difficulty traversing the steep driveway with one child in tow, and did not believe that she could manage it safely with two.

The Appellee testified at the final hearing before the family law master. During her testimony, she indicated that she has remarried and now has a second child. She also testified that she does not work and is able to stay at home with her child during the day and thus would be able to care for Justin during the day as well. She maintained that she had been the primary caretaker of the child prior to their separation.

The Appellee's mother, who lived in Maryland, testified that the Appellee was the primary caretaker, but based her testimony on a one-month period of time. Appellee's brother testified, but rendered no opinion on the primary caretaker issue.

The Appellee also offered the testimony of Justin's dental hygienist, Shelley James, as well as that of Justin's physician, Lester Labus, M.D. Neither witness was able to speak to the issue of which parent was Justin's primary caretaker, although both testified that it was usually the mother who brought the child to their offices. Both Dr. Labus and Ms. James testified that Justin was healthy and suffered from no serious health problems.

After hearing all of the testimony, the family law master found that neither party was entitled to the primary caretaker presumption since neither party provided more than fifty percent of the primary caretaker responsibilities. However, the family law master recommended that custody of Justin be awarded to the Appellant as he can provide the most stable environment for the child and for various other reasons.[4] The trial court found the family law master's recommendations to be "arbitrary, unsupported, unwarranted and not in conformance with the law."[5] In so doing, the circuit court concluded that the mother was the primary caretaker.

Furthermore, the trial court, citing *Leach v. Bright,* 165 W.Va. 636, 270 S.E.2d 793 (1980); *Hammack v. Wise,* 158 W.Va. 343, 211 S.E.2d 118 (1975); West Virginia Code § 44–10–7 (1992); and, *State ex rel. Kiger v. Hancock,* 153 W.Va. 404, 168 S.E.2d 798 (1969), stated that:

a fit parent's right to custody of a minor child is 'paramount to that of any third party, including a grandparent[;]' where nominal custody granted to one parent will have the effect of giving custody to that parent's own parents (the child's grandparents), the child's other fit parent is entitled to custody. An award of custody to the Father would have the effect of giving custody to the Father's parents, particularly his mother, who has performed the bulk of primary caretaker duties while Justin has been nominally in the Father's custody.

The lower court also placed significant emphasis on the fact that the Appellant and his family members smoke. There was testimo-

---

**4.** The Family Law Master granted the Appellant custody of Justin based upon the following:

a. The testimony of the witnesses for the father included the maternal grandfather who testified that the best interest of the child will be served by granting custody to the father;
b. That the child has strong ties to the paternal grandmother and great grandmother who have provided day care and other babysitting duties throughout the course of the baby's life;
c. The testimony indicates the father to be a fit and proper person to have the care, custody and control of the child;
d. That the testimony does not establish the mother to be an unfit person but does raise serious questions as to her priorities in raising the subject child;

e. That the mother's new husband may have inflicted some harm upon the child;
f. That the current marital domicile of the mother is inaccessible during periods of extreme weather;
g. That the mother has failed to exercise her rights of visitation for extended periods of time;
h. That the father has, at all times, played a significant role in the nurturing and raising of the child.

**5.** W.Va.Code § 48A–4–10 (1992). Following amendments which occurred during the 1993 legislative session, the provisions of this section are now found in West Virginia Code § 48A–4–20 (Supp.1994).

ny in the record that Justin has suffered from recurrent respiratory infections and Justin's doctor, Dr. Labus, has recommended that Justin be kept away from exposure to second-hand smoke.

## II.

■■■ We have repeatedly explained the approach to be employed in a child custody determination. In syllabus point 2 of *Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981), we stated that "[w]ith reference to the custody of very young children, the law presumes that it is in the best interests of such children to be placed in the custody of their primary caretaker, if he or she is fit." In syllabus point 3 of *Garska*, we defined primary caretaker as that "natural or adoptive parent who, until the initiation of divorce proceedings, has been primarily responsible for the caring and nurturing of the child." *Id.* at 59, 278 S.E.2d at 358. We also stated in syllabus point 4 of *Garska* that "[i]n establishing which natural or adoptive parent is the primary caretaker, the trial court shall determine which parent has taken primary responsibility for the caring and nurturing duties of a parent." *Id.* at 59, 278 S.E.2d at 358.

■■■ In addressing the primary caretaker issue in *Garska*, we enumerated several duties which would typically be performed by the primary caretaker. These include preparation of meals, grooming, medical care, discipline, and education.[6] As we held in syllabus point five of *Garska*, "[i]f the trial court is unable to establish that one parent has clearly taken primary responsibility for the caring and nurturing duties of a child neither party shall have the benefit of the primary caretaker presumption." 167 W.Va. at 59,

278 S.E.2d at 358. We have also emphasized the important consideration of the extent of the emotional bond between the child and each parent.

■■■ A review of the record in this matter indicates clearly, however, that the family law master heard extensive testimony regarding which parent in this case provided most extensively for Justin's needs. Only if neither parent is entitled to the primary caretaker presumption does the court endeavor to determine which placement would be in the best interests of the child. The law master's finding that neither party was entitled to the presumption and that the best interests of the child in this case would be served by granting his care, custody, and control to his father is fully supported by the record. However, the trial court chose not to follow the law master's recommendation and, instead, made a finding that the Appellee is entitled to the primary caretaker presumption and awarded custody of Justin to the Appellee. We find the trial court's decision in this regard to be clearly erroneous.

■■■ Numerous witnesses, including the Appellee's own father, testified, as between the two parents, that the Appellant has always performed the lion's share of primary caretaker tasks with regard to Justin. Furthermore, the record supports the family law master's conclusion that while the mother was not unfit, serious questions were raised as to her priorities in raising the child.

Of great concern is the fact that the mother presented no evidence (not even her own testimony) to refute the testimony that she absented herself from the home frequently in the evenings, roped the child's room to avoid

---

6. In *Garska*, we set forth several specific duties, as follows:
(1) preparing and planning of meals;
(2) bathing, grooming and dressing;
(3) purchasing, cleaning, and care of clothes;
(4) medical care, including nursing and trips to physicians;
(5) arranging for social interaction among peers after school, i.e. transporting to friends' houses or, for example, to girl or boy scout meetings;
(6) arranging alternative care, i.e. babysitting, day-care, etc.;
(7) putting child to bed at night, attending to child in the middle of the night, waking child in the morning;
(8) disciplining, i.e. teaching general manners and toilet training;
(9) educating, i.e. religious, cultural, social, etc.; and,
(10) teaching elementary skills, i.e. reading, writing and arithmetic.
167 W.Va. at 69–70, 278 S.E.2d at 363.

being disturbed, and left the child unsupervised.[7]

It is possible that the mother, having now re-married and given birth to another child, has stabilized her lifestyle and could offer a greater degree of constancy and nurturance to her son than she was doing prior to the separation. However, based upon the evidence in the record, we must conclude that the family law master was correct in the determination that neither party in this case is entitled to the primary caretaker presumption, and that Justin's best interests would be best served by custody with his father, the Appellant. Aside from the fact that the record supports the recommendation, some deference must be given to the family law master, who was in the unique position to hear the evidence presented and to assess the credibility of the witnesses.

It is necessary, however, to address the issue of the child's exposure to second-hand smoke. Obviously, in light of Justin's respiratory problems, special consideration to smoke in his environment is merited. We do not believe, however, that the fact that the Appellant and his family members smoke, standing alone, can outweigh the bulk of the other testimony in this matter. Thus, we reverse the decision of the lower court and remand for entry of an order awarding custody of Justin to the Appellant, but with special instructions to the Appellant and his family to provide a smoke-free environment for Justin. Furthermore, since the mother is a non-employed homemaker, the bulk of Justin's daytimes until he enters school should be spent with her. Even after Justin enters school, every endeavor should be made to institute a visitation plan so that he may be with his mother as much as possible while his father is at work.

Lastly, it is not totally clear from the record which parent has had custody of Justin since the circuit court order. Since the record reflects no stay having been granted, we assume he has been with his mother. If this is the case, the circuit court on remand should oversee a plan for his gradual transition to the father. As we have previously said, a change of child custody should generally be gradual, especially in the case of a young child, so as to disrupt his life as little as possible and minimize any emotional trauma that may come with such a major change. *James M. v. Maynard,* 185 W.Va. 648, 408 S.E.2d 400 (1991).

It will be the challenge of the circuit court to craft an order in this acrimonious divorce that will facilitate the continued relationship of Justin with both his parents, and to communicate to the parties that they must work to put aside their personal differences to make this work for Justin.

Reversed and remanded.

BROTHERTON, Chief Justice, did not participate.

MILLER, Retired Justice, sitting by temporary assignment.

---

7. Although Appellee's counsel represented that Appellee would deny many of these allegations, she never actually did so.