706 S.E.2d 381

**KRISTOPHER O. and Christina O., Petitioners**

v.

**The Honorable James P. MAZZONE, Judge of the First Judicial Circuit, and West Virginia Department of Health and Human Resources, Respondents.**

**No. 35713.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 12, 2011.

Decided Feb. 11, 2011.

Teresa C. Toriseva, Esq., Toriseva Law, Wheeling, WV, Attorney for Petitioners.

Joseph J. Moses, Esq., Wheeling, WV, Guardian ad Litem.

Darrell V. McGraw, Jr., Esq., Attorney General, Charleston, WV, Katherine M. Bond, Esq., Assistant Attorney General, White Hall, WV, Attorneys for Respondent DHHR.

PER CURIAM:

This case is before this Court upon a petition for a writ of prohibition filed by the petitioners, Kristopher and Christina O.,[1] against the respondents, the Honorable James P. Mazzone, Judge of the First Judicial Circuit, and the West Virginia Department of Health and Human Resources (hereinafter, the "DHHR"). The petitioners, who were foster parents to D.D. for nearly twenty-two months, seek to prohibit the circuit court from enforcing its March 29, 2010, order granting legal and physical custody of D.D. to a paternal aunt as well as its May 18, 2010, order denying their motion to intervene. Based upon the parties' briefs and arguments in this proceeding as well as the pertinent legal authorities, the writ is hereby granted as moulded.

## I.

### FACTUAL AND PROCEDURAL HISTORY

On April 21, 2008, D.D. was born five weeks premature to J.D., her biological mother, who admitted that she used crack cocaine during her pregnancy. D.D. tested

---

1. Our customary practice in cases involving minors is to refer to the parties by their initials rather than by their full names. *See, e.g., In re*

*Cesar L.,* 221 W.Va. 249, 252 n. 1, 654 S.E.2d 373, 376 n. 1 (2007).

positive for cocaine at birth. On April 28, 2008, as a result of the mother's admission of drug use, the DHHR filed a petition for relief from parental abuse and neglect with the Circuit Court of Ohio County. Upon being provided legal custody of D.D. by the circuit court, the DHHR placed the infant in the foster care of the petitioners on May 6, 2008. D.D. remained in the continuous foster care of the petitioners at all times prior to the circuit court's March 29, 2010, order, as discussed below.

While D.D. was in the foster care of the petitioners, the DHHR pursued the termination of the parental rights of her biological mother, J.D., and father, L.W.[2] On November 24, 2008, J.D.'s parental rights to D.D. were involuntarily terminated. The order reflecting the termination of J.D.'s rights was entered by the circuit court on November 5, 2009. Thereafter, during a hearing held on December 29, 2009, L.W.'s parental rights to D.D. were also involuntarily terminated. The order reflecting the termination of his

parental rights was entered by the circuit court on March 24, 2010.

Beginning in April 2009, when D.D. was one year old, the DHHR arranged for L.W., as well as D.D.'s paternal aunt, K.M., to have weekly ninety-minute supervised visits with the child. Prior to that time, K.M. had not had any contact with D.D. L.W.'s visits stopped upon the termination of his parental rights on December 29, 2009; however, the DHHR arranged for K.M. to continue supervised visits with D.D. for two hours per week. The DHHR then determined that the best permanent placement for D.D. would be with K.M. Pursuant to this determination, the petitioners were advised on March 25, 2010, that D.D. would be removed from their home on March 29, 2010, and placed with K.M. Following a March 29, 2010, hearing in the circuit court, D.D. was placed with K.M.[3]

■■■ According to the petitioners, they verbally advised DHHR officials and the guardian ad litem[4] on numerous occasions prior to March 29, 2010, that they wished to

---

2. Although L.W. is not named on D.D.'s birth certificate as being D.D.'s biological father, subsequent DNA tests confirmed that he is her biological father.

3. It is troubling that the DHHR was so certain of the outcome of a court hearing that had not yet been held and it suggests that the DHHR anticipated the circuit court would rubber-stamp its recommendation.

4. This Court is troubled by the guardian ad litem's limited participation in this appeal. The guardian ad litem filed a bare-bones brief with this Court and then failed to appear for oral arguments to represent the child. A guardian ad litem has a duty to advocate for the child at every level. "We again admonish guardians ad litem that it is their responsibility to represent their clients in every stage of the abuse and/or neglect proceedings. This duty includes appearing before this Court to represent the child during oral arguments. In fact, the guardian ad litem's role to represent the child does not cease until permanent placement of the child is achieved. Syl. pt. 5, *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991)." *In re Christina L.*, 194 W.Va. 446, 454 n. 7, 460 S.E.2d 692, 700 n. 7 (1995). Moreover, this Court emphasized the need for guardians ad litem to conduct a "full and independent investigation" in Syllabus Point 5 of *In Re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993), explaining as follows:

Each child in an abuse and neglect case is entitled to effective representation of counsel.

To further that goal, W.Va.Code, 49–6–2(a) [1992] mandates that a child has a right to be represented by counsel in every stage of abuse and neglect proceedings. Furthermore, Rule XIII of the West Virginia Rules for Trial Courts of Record provides that a guardian ad litem shall make a full and independent investigation of the facts involved in the proceeding, and shall make his or her recommendations known to the court. Rules 1.1 and 1.3 of the West Virginia Rules of Professional Conduct, respectively, require an attorney to provide competent representation to a client, and to act with reasonable diligence and promptness in representing a client. The Guidelines for Guardians Ad Litem in Abuse and Neglect cases, which are adopted in this opinion and attached as Appendix A, are in harmony with the applicable provisions of the West Virginia Code, the West Virginia Rules for Trial Courts of Record, and the West Virginia Rules of Professional Conduct, and provide attorneys who serve as guardians ad litem with direction as to their duties in representing the best interests of the children for whom they are appointed.

Given the fact that the petitioners in the case at hand cared for this child for twenty-two months, coupled by the circuit court's failure to provide them notice of and the opportunity to participate in the permanency hearing, the duties of the guardian ad litem were especially critical to a proper determination of the best interests of this child.

adopt D.D. In fact, the petitioners assert that just prior to the termination of J.D.'s parental rights, Jason Prettyman, a social services supervisor for DHHR and coordinator for the multi-disciplinary treatment team (hereinafter, "MTD") assigned to the case of D.D., asked the petitioners if they would be interested in adopting D.D. if parental termination was achieved. The petitioners contend that they responded, "Absolutely."

In addition to expressing their desire to adopt D.D. to DHHR officials many times, the petitioners state they requested that the DHHR conduct a bonding assessment to establish the bond D.D. had formed with them. The petitioners contend that while D.D. was in their custody, they were never advised by the DHHR that they were required to submit a written application to convey their intent to adopt D.D. upon the termination of parental rights. As such, the petitioners maintain they believed in good faith that they had made their intention to adopt D.D. known to the DHHR.

As previously noted, the petitioners state that they were first advised by the DHHR that on March 25, 2010, D.D. would be taken out of their custody on March 29, 2010, and that she would be permanently placed into the custody of K.M. At that point, they sought legal counsel who filed a petition to intervene on their behalf. The petitioners contend they were not notified by the DHHR that a permanency hearing for D.D. would be held in the circuit court on March 29, 2010. Instead, the petitioners' counsel maintains that she learned of the permanency hearing on March 26, 2010, but only after contacting the circuit judge's secretary to request a hearing regarding the motion to intervene in the ongoing proceedings.[5]

On March 29, 2010, the circuit court held a permanency hearing in the matter of D.D., but the petitioners were not provided an opportunity to be heard at that hearing, nor was their motion to intervene considered at that time. According to the petitioners' counsel, upon entering the courtroom during the March 29, 2010, permanency hearing, the petitioners were asked to leave as they were advised by the circuit court that the hearing was closed. The record reflects that at that hearing, the circuit court ordered that D.D. be immediately placed in the physical and legal custody of K.M.

On April 27, 2010, almost a month after the permanency hearing, the circuit court held a hearing to consider the petitioners' motion to intervene, and on May 18, 2010, it entered an order denying that motion. Within its May 18, 2010, order, the circuit court found that: the petitioners, as former foster parents, lacked standing to intervene in the matter; that intervention by the petitioners would be contrary to the best interests of D.D.; that the petitioners had failed to submit a written application for adoption of the child to the DHHR within thirty days following the termination of the father's parental rights; and that the DHHR is required to pursue, and West Virginia law favors, placement with blood relatives for abused and neglected children. The petitioners did not appeal the circuit court's May 18, 2010, order. Instead, the petitioners filed a September 20, 2010, petition for a writ of prohibition with this Court.

## II.

### STANDARD FOR ISSUING A WRIT

A writ of "[p]rohibition lies only to restrain inferior courts from proceeding in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers and may not be used as a substitute for writ of error, appeal or certiorari." Syllabus Point 1, *Crawford v. Taylor*, 138 W.Va. 207, 75 S.E.2d 370 (1953). In order to determine whether the writ of prohibition should be granted, we apply the following standard of review:

In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no

---

5. According to the petitioners' counsel, she believed that a motion to intervene in the proceedings was the only option since foster parents are not parties in abuse and neglect cases.

other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syllabus Point 4, *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996).

## III.

### DISCUSSION

#### A. Writ of Prohibition

 The petitioners have filed this petition for a writ of prohibition seeking to void the March 29, 2010, order of the circuit court granting legal and physical custody of D.D. to her paternal aunt, K.M., as well as seeking to void the May 18, 2010, order denying their motion to intervene. The petitioners further request that D.D. be returned to their custody pending future proceedings.[6]

 The petitioners argue that at the time D.D. was removed, they had developed strong emotional bonds with her due to caring for her for twenty-two consecutive months. They further contend that they were D.D.'s psychological parents as they were the only family she had ever known.[7] Nonetheless, the petitioners state that they were not given an opportunity to participate in the hearing to determine D.D.'s best interests. Consequently, the petitioners contend that D.D.'s placement with a relative with whom she had minimal contact was not in her best interests. As such, the petitioners maintain that in denying them an opportunity to be heard at the permanency hearing for D.D., the circuit court exceeded its legitimate bounds of authority, and that their writ of prohibition should be granted.[8]

6. The DHHR maintains that the petitioners request for relief is untimely and should not be considered by this Court. In that regard, the DHHR states that while the petitioners style their request for relief with this Court as a petition for a writ of prohibition, they are simply attempting to file a direct appeal of the circuit court's May 18, 2010, order denying them the right to intervene in a child abuse and neglect case. As such, the DHHR believes the petitioners' challenge to the May 18, 2010, order is untimely. Having reviewed the entire matter, we believe that the petitioners' request for a writ of prohibition is appropriate and that the DHHR's argument is without merit. As this Court held in Syllabus Point 1 of *Hinkle v. Black*, 164 W.Va. 112, 262 S.E.2d 744 (1979):

In determining whether to grant a rule to show cause in prohibition when a court is not acting in excess of its jurisdiction, this Court will look to the adequacy of other available remedies such as appeal and to the over-all economy of effort and money among litigants, lawyers and courts; however, this Court will use prohibition in this discretionary way to correct only substantial, clear-cut, legal errors plainly in contravention of a clear statutory, constitutional, or common law mandate which may be resolved independently of any disputed facts and only in cases where there is a high probability that the trial will be completely reversed if the error is not corrected in advance.

7. "A psychological parent is a person who, on a continuing day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills a child's psychological and physical needs for a parent and provides for the child's emotional and financial support. The psychological parent may be a biological, adoptive, or foster parent, or any other person. The resulting relationship between the psychological parent and the child must be of substantial, not temporary, duration and must have begun with the consent and encouragement of the child's legal parent or guardian. To the extent that this holding is inconsistent with our prior decision of *In re Brandon L.E.*, 183 W.Va. 113, 394 S.E.2d 515 (1990), that case is expressly modified." Syllabus Point 3, *In re Clifford K.*, 217 W.Va. 625, 619 S.E.2d 138 (2005).

8. The DHHR maintains that the petitioners argument that they were not given notice and the opportunity to be heard during the permanency hearing is without merit due to the petitioners' failure to submit a written application of their intent to adopt the child. The DHHR asserts that while the petitioners may have made verbal statements that they were interested in adopting

Upon review of the relevant statutory law, in particular, W.Va.Code § 49–6–5a(c), this Court finds that the circuit court exceeded its legitimate powers when it refused to allow the petitioners to participate in the permanency hearing on March 29, 2010. W.Va.Code § 49–6–5a(c) provides, that "[a]ny foster parent, preadoptive parent or relative providing care for the child shall be given notice of and the opportunity to be heard at the permanency hearing provided in this section." W.Va.Code § 49–6–5a(c) is a plainly worded statute that clearly evidences the Legislature's intention and must be accorded its plain meaning. Thus, the statute may not be interpreted by this Court. " 'Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation.' " *Huffman v. Goals Coal Co.*, 223 W.Va. 724, 729, 679 S.E.2d 323, 328 (2009) (*quoting* Syllabus Point 2, *State v. Elder*, 152 W.Va. 571, 165 S.E.2d 108 (1968)). *See also* Syllabus Point 1, *Ohio County Comm'n v. Manchin*, 171 W.Va. 552, 301 S.E.2d 183 (1983) ("Judicial interpretation of a statute is warranted only if the statute is ambiguous and the initial step in such interpretative inquiry is to ascertain the legislative intent."). Consequently, the circuit court should have allowed the petitioners to participate in the permanency hearing.

Having found that the petitioners should have been permitted to participate in the permanency hearing, this Court finds it necessary to grant the writ and return this case to the circuit court for another permanency hearing to allow the petitioners the opportunity to be heard. Nonetheless, in order to avoid any unnecessary disruption, until it is determined what custodial arrangement is in the best interests of D.D., legal and physical custody of D.D. should remain with K.M. Should the circuit court determine that any further change of physical and legal custody is required, it must be accomplished via a gradual transition. As discussed more fully below, changes of custody can be traumatic for children if not done in a gradual manner.

**B. Concurrent Planning for Permanency**

In reviewing this matter, the DHHR's handling of this case from the beginning to the present day is troubling. Based upon the record below, it is apparent that little, if any, concurrent planning[9] occurred during the first two years of D.D.'s life. As previously discussed, D.D. was born addicted to crack cocaine. Therefore, shortly after her birth, the DHHR began proceedings to terminate parental rights. It does not appear, however, that the DHHR sought placement with anyone other than the foster parents at that time. While foster care may have indeed been the only option immediately available, K.M. was not contacted by the DHHR until D.D. was one year old.[10] The significant lapse in time by the DHHR is curious due to

---

D.D., that such verbal statements do not satisfy the requirement that foster parents make an application to the DHHR establishing their intent to adopt a child. W.Va.Code § 49–2–14(c) states:

> When a child has been residing in a foster home for a period in excess of six consecutive months in total and for a period in excess of thirty days after the parental rights of the child's biological parents have been terminated and the foster parents have not made an application to the department to establish an intent to adopt the child within thirty days of parental rights being terminated, the state department may terminate the foster care arrangement if another, more beneficial, long-term placement of the child is developed: Provided, That if the child is twelve years of age or older, the child shall be provided the option of remaining in the existing foster care arrangement if the child so desires and if continuation of the existing arrangement is in the best interest of the child.

We find no merit to this argument for two reasons. First, W.Va.Code § 49–6–5a(c) does not require foster parents to file an application to adopt the child in order to participate in the permanency hearing. Second, the parental rights of the biological father were terminated by order entered on March 24, 2010. As such, the thirty day time limit for filing an application to adopt had not expired at the date of the permanency hearing.

**9.** This Court has explained that: "Concurrent planning, wherein a permanent placement plan for the child(ren) in the event reunification with the family is unsuccessful is developed contemporaneously with reunification efforts, is in the best interests of children in abuse and neglect proceedings." Syllabus Point 5, *In re Billy Joe M.*, 206 W.Va. 1, 521 S.E.2d 173 (1999).

**10.** The record does not reflect when L.W. or K.M. learned that D.D. was born.

the fact that it has consistently maintained that it believes that permanent placement with a blood relative is required pursuant to its internal policies.

 If the DHHR's policy is to seek permanent placement with a relative, then it should have been seeking a relative placement with the potential for permanency at the outset. It is well-established that every child is entitled to permanency to the greatest extent the legal system can ensure it. *See State ex rel. Amy M. v. Kaufman,* 196 W.Va. 251, 470 S.E.2d 205 (1996); *In re Jonathan G.,* 198 W.Va. 716, 482 S.E.2d 893 (1996); *In re Brian D.,* 194 W.Va. 623, 461 S.E.2d 129 (1995); *In re Lindsey C.,* 196 W.Va. 395, 473 S.E.2d 110 (1995) (Workman, J., dissenting); *In re Carlita B.,* 185 W.Va. 613, 408 S.E.2d 365 (1991). The DHHR should have acted very early to begin concurrent planning and permanency in D.D.'s life in "the level of custody, care, commitment, nurturing and discipline that is consistent with ... [a] child's best interests." *State v. Michael M.,* 202 W.Va. 350, 358, 504 S.E.2d 177, 185 (1998). This Court observed in *Amy M., supra,* that a child deserves "resolution and permanency" in his or her life and deserves the right to rely on his or her caretakers "to be there to provide the basic nurturance of life." 196 W.Va. at 260, 470 S.E.2d at 214. Moreover, "the best interests of the child is the polar star by which decisions must be made which affect children." *Michael K.T. v. Tina L.T.,* 182 W.Va. 399, 405, 387 S.E.2d 866, 872 (1989) (citation omitted). *See In re Micah Alyn R.,* 202 W.Va. 400, 409, 504 S.E.2d 635, 644 (1998) (Workman, J., concurring) ("concurrent planning for permanency should occur even where parental rights are not terminated. This should be the practice in all abuse and neglect cases, so that there is a permanency plan for children where family reconciliation efforts are not successful for whatever reason."). In this case, more concurrent planning should have occurred to give D.D. resolution and permanency in her life in a manner that thoroughly considered her best interests.

### C. Relative Placement

 With regard to placement with a blood relative, this Court is concerned by the DHHR's contention that it is required to place a child with virtually any relative instead of with a foster parent regardless of the emotional bond formed with the foster parents, the length of stay in their home, or the many additional factors important for consideration of a child's best interests. It appears that the DHHR may be conducting its adoption policy in a manner that is inconsistent with West Virginia law. The DHHR explains that in the May 18, 2010, order, the circuit court determined that the DHHR correctly chose to move D.D. to her paternal aunt's house on March 29, 2010, based on the DHHR's internal regulations which provide for a preference for placement with a relative. The DHHR's Adoption Policy § 7.3 states, in part,

> A Grandparent or an adult relative with a positive home study certifying the home for adoption *must be given preference* over the non-relative home even if the non-relative home has the appearance of a better placement choice.

(Emphasis added). The DHHR states that its internal policy is based on federal law in that the Social Security Act governing the requirements for the award of federal funds to state child welfare programs provides:

> [T]he State shall *consider* giving preference to an adult relative over a non-related caregiver when determining a placement for a child, provided that the relative caregiver meets all relevant State child protection standards.

42 U.S.C.A. 671(a)(19). (Emphasis added). Given the language in the applicable federal law and in the Department's policy, the DHHR maintains that it correctly determined that D.D.'s paternal aunt, as a relative, must be given preference over the petitioners, who were non-relatives. Accordingly, the DHHR contends that the circuit court's determination that a relative must be given preference was in accordance with state and federal law.[11]

---

**11.** The record before this Court indicates that the DHHR made its decisions regarding the placement of D.D. based primarily upon its internal preference to place a child with a relative. For

It is clear from our jurisprudence that the only statutory preference within our laws regarding the adoption of a child involves grandparents and reunification of siblings. For example, this Court has explained that:

West Virginia Code § 49-3-1(a) provides for grandparent preference in determining adoptive placement for a child where parental rights have been terminated and also incorporates a best interests analysis within that determination by including the requirement that the DHHR find that the grandparents would be suitable adoptive parents prior to granting custody to the grandparents. The statute contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests of the child.

Syllabus Point 4, *Napoleon S. v. Walker*, 217 W.Va. 254, 617 S.E.2d 801 (2005). It does not appear, however, that a preference is granted to blood relatives generally. Nevertheless, it seems that the DHHR interprets "shall consider giving preference to an adult relative over a non-relative caregiver" as meaning that it must place a child with any available relative regardless of whether the best interests of the child are served by non-relative placement. Such an interpretation far exceeds any West Virginia statutory requirements and is inconsistent with a federal requirement that the family preference be "considered." *See* 42 U.S.C.A. 671(a)(19). Compliance with federal policy is certainly important as such compliance is often tied directly to federal funding that is so critical to the implementation and administration of many worthwhile programs. Simply stated, compliance with federal law does not require that a child be placed with a blood relative, it only requires that such placement be considered.

 Moreover, even with regard to this State's statutory preference for considering grandparents for adoption of a child in situations wherein the parental rights have been terminated, this Court has clarified that such a preference is not an absolute directive to place children with their grandparents in all circumstances. *In re Elizabeth F.*, 225 W.Va. 780, 786–787, 696 S.E.2d 296, 302–303 (2010). In *In re Elizabeth F.*, this Court explained that "an integral part of the implementation of the grandparent preference, as with all decisions concerning minor children, is the best interests of the child." 225 W.Va. at 787, 696 S.E.2d at 303. Moreover,

[o]nce a court exercising proper jurisdiction has made a determination upon sufficient proof that a child has been neglected and his natural parents were so derelict in their duties as to be unfit, the welfare of the infant is the polar star by which the discretion of the court is to be guided in making its award of legal custody.

Syllabus Point 8, in part, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973). *Accord* Syllabus Point 3, in part, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996) ("[T]he primary goal in cases involving abuse and neglect ... must be the health and welfare of

example, during the September 10, 2009, multidisciplinary treatment team meeting, which was attended by one of the petitioners, D.D.'s possible relatives for placement were discussed in the event that the biological father's rights were terminated. It was further determined that D.D.'s paternal aunt, K.M., would be contacted to determine if she would even like to be considered for permanent placement. Conversely, however, the MDT notes of that meeting indicate that the petitioner stated that she was interested in adopting D.D.

Likewise, during the November 2, 2009, MDT meeting, of which both petitioners were present, placement of D.D. with K.M. was discussed extensively. The petitioners requested that a "bonding evaluation" be completed on the child because they stated they were very bonded to the

child and that the child referred to them as "mother" and "father" and that the MDT should do what was in the best interest of the child and not the family. The DHHR stated that the case was not at that point as the blood relatives of the child must be considered for potential placement of the child. The notes from that meeting further state:

Jason Prettyman, discussed at the MDT meeting that he had previously spoken with the foster parents about the issues of placement preference in this case to the foster parents. It was previously explained that the DHHR must considered [sic] relatives of the child and must consider the adoptive parents of the siblings of the child as well. Christina recalled this conversation that she had with Jason Prettyman about placement preference.

the children."); Syllabus Point 5, in part, *Carter v. Carter*, 196 W.Va. 239, 470 S.E.2d 193 (1996) ("In ... custody matters, we have traditionally held paramount the best interests of the child."). This Court further explained *In re Elizabeth F.* that:

> Thus, adoption by a child's grandparents is permitted only if such adoptive placement serves the child's best interests. If, upon a thorough review of the entire record, the circuit court believes that a grandparental adoption is not in the subject child's best interests, it is not obligated to prefer the grandparents over another, alternative placement that does serve the child's best interests. *See* Syl. pts. 4 & 5, *Napoleon S. v. Walker*, 217 W.Va. 254, 617 S.E.2d 801. Because the circuit court accorded the grandparents an absolute preference in this case despite its expressed concerns about the propriety of such a placement, we reverse the circuit court's decision.

225 W.Va. at 787, 696 S.E.2d at 303. In consideration of all of the above, it is clear that the petitioners in this case received little to no actual consideration for permanency in spite of the fact that they cared for this child for twenty-two consecutive months. More importantly, the failure to consider the petitioners for permanency also resulted in their inability to present evidence to the circuit court regarding the child's best interests based upon their continuous and long-term care for that child.

### D. Gradual Transition

█ Finally, the manner in which D.D. was removed from the custody of the petitioners and placed with K.M. is concerning. D.D. was removed from the petitioners' home after twenty-two months of continuous care by the petitioners. This seems to have been done in a manner vastly inconsistent with our case law. For instance, it has been long understood that the law governing child custody directs that a child's best interests are best served by a gradual transition to a new home. In that regard, Syllabus Point 3 in *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991) provides,

> It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians. Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods should be developed in a manner intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives.

This concept has been reiterated on several other occasions. *Accord In re Maranda T.*, 223 W.Va. 512, 678 S.E.2d 18 (2009); *Napoleon S. v. Walker*, 217 W.Va. 254, 617 S.E.2d 801 (2005); *In re Desarae M.*, 214 W.Va. 657, 591 S.E.2d 215 (2003); *In re Jade E.G.*, 212 W.Va. 715, 575 S.E.2d 325 (2002); *In re Edward B.*, 210 W.Va. 621, 558 S.E.2d 620 (2001); *In re Brian James D.*, 209 W.Va. 537, 550 S.E.2d 73 (2001); *In re Zachary William R.*, 203 W.Va. 616, 509 S.E.2d 897 (1998); *Matter of Taylor B.*, 201 W.Va. 60, 491 S.E.2d 607 (1997); *In re Jonathan G.*, 198 W.Va. 716, 482 S.E.2d 893 (1996); *State ex rel. Virginia M. v. Eugene S.*, 197 W.Va. 456, 475 S.E.2d 548 (1996); *Weber v. Weber*, 193 W.Va. 551, 457 S.E.2d 488 (1995); *Michael Scott M. v. Victoria L.M.*, 192 W.Va. 678, 453 S.E.2d 661 (1994); *Feaster v. Feaster*, 192 W.Va. 337, 452 S.E.2d 428 (1994); *Robert Darrell O. v. Theresa Ann O.*, 192 W.Va. 461, 452 S.E.2d 919 (1994); *Alonzo v. Jacqueline F.*, 191 W.Va. 248, 445 S.E.2d 189 (1994); *Snyder v. Scheerer*, 190 W.Va. 64, 436 S.E.2d 299 (1993).

The record shows that a gradual transition did not occur in transferring the child to K.M.'s home. The child was taken from the petitioners' home and all contact with her ceased at that time. The DHHR argues in its brief to this Court that "[b]y their own admission the [petitioners] have not had any visitation with [D.D.] since she was removed from their care." While that is true, it certainly was not the petitioners' choice for that to have occurred. In fact, it highlights the very problem with the circuit court's failure to provide for an appropriate transition of this child to a new home. The petitioners consistently informed the DHHR that they wished to adopt this child. Nonetheless, the DHHR removed the child from their home with virtually no notice and then abruptly

ended all contact with the child for whom they had consistently provided care and nurturance for twenty-two months.

In *Honaker v. Burnside,* 182 W.Va. 448, 388 S.E.2d 322 (1989), in recognizing that a gradual six-month transition of custody from the stepfather to the biological father was warranted, this Court observed with respect to the child's longtime residence with her stepfather and half-brother that "[t]hese familial surroundings are the only ones she has ever known, and it is undisputed that she has developed a close and loving relationship with her stepfather." 182 W.Va. at 450, 388 S.E.2d at 323. Thus, by recognizing the significant role her stepfather had played in the child's life as her psychological parent, this Court accorded visitation privileges to him, as well as to the child's half-brother, despite the ultimate award of the child's custody to her biological father. Similarly, in *Maynard, supra,* this Court required the circuit court to establish a plan for a gradual shift of custody.

 As this Court stated in *In re George Glen B., Jr.,* 207 W.Va. 346, 355, 532 S.E.2d 64, 73 (2000), "[e]xplicit in both *Honaker v. Burnside* and *James M. v. Maynard* is the principle that the circuit court, and not the Department or a private agency, bears the burden of crafting a plan for the gradual transition of custody." Moreover, "[w]hen a circuit court determines that a gradual change in permanent custodians is necessary, the circuit court may not delegate to a private institution its duty to develop and monitor any plan for the gradual transition of custody of the child(ren)." Syllabus Point 7, *In re George Glen B., Jr.* Upon reviewing the transcript of the March 29, 2010, permanency hearing, it is clear that the circuit court did not develop or consider any plan for a gradual transition of D.D. to K.M. Said another way, the record is devoid of any discussion by the circuit court with the petitioners (because the petitioners were not permitted to participate in the hearing), the DHHR, or the guardian ad litem regarding any reasonable concerns that would arise from an abrupt change of custody. There was no discussion concerning a sufficient adjustment period nor was there a discussion about whether or not the petitioners should be allowed continued visitation with this child who referred to them as mother and father. A child should not be treated like a sack full of potatoes picked up from a local grocery store. The law requires that there must be a gradual transition in cases such as the one before us.

 Clearly "[t]he best interests of a child are served by preserving important relationships in that child's life." Syllabus Point 2, *State ex rel. Treadway v. McCoy,* 189 W.Va. 210, 429 S.E.2d 492 (1993). As stated, the petitioners were the foster parents of D.D. for nearly two years and had formed a significant relationship with the child. Nonetheless, it appears that she was removed from the one stable home she had known, and was placed elsewhere, without any type of gradual transition and without affording her foster parents any visitation. Pending further resolution of these issues, it is difficult to see how the circuit court could direct the removal of this child from the petitioners' home without taking into consideration anything regarding the first two years of the child's life. Nor did the court even consider the child's right to continued relationship with those to whom she had bonded. *See* Syllabus Point 11, *In re Jonathan G.,* 198 W.Va. 716, 482 S.E.2d 893 (1996) ("A child has a right to continued association with individuals with whom he has formed a close emotional bond, including foster parents, provided that a determination is made that such continued contact is in the best interests of the child.").

 It seems that the circuit court did not have a sufficient record to support its determination to remove the child while not even considering visitation by the petitioners.[12] Unfortunately, in denying the peti-

---

**12.** The petitioners also contend that the circuit court's May 18, 2010, order denying their motion to intervene was clearly erroneous as a matter of law. It is unnecessary to address this issue in light of our holding that the circuit court shall hold a hearing to allow the petitioners to be heard with regard to permanency of the child. This Court does, however, wish to point out that the circuit court erroneously determined in its May 18, 2010, order that the petitioners lacked

tioners the opportunity to participate in the permanency hearing, the circuit court has created a quandary—a child who knew and bonded with one family for nearly two years and who now has likely bonded with another parent for approximately ten months. The task now before the circuit court is made more difficult by this conundrum as the question of the child's best interests is now even more complicated. Therefore, the circuit court should act immediately to hold further hearings with full participation by all parties on the best interests of this child and her proper permanent placement. Because this Court has said that children have a right to continued association with those to whom they have formed close emotional relationships, the circuit court should also consider whether the current circumstances justify continued association/visitation by the child with whichever family ultimately is not chosen as her permanent custodian. *See* Syllabus Point 11, *In re Jonathan G., supra.* To facilitate the commencement and conclusion of the remand proceedings, we issue the mandate of the Court contemporaneously with the issuance of this opinion.

## IV.

### CONCLUSION

The petitioners were not given notice of and the opportunity to be heard at the permanency hearing as provided by W.Va. § 49–6–5a(c). Based upon the foregoing, this Court grants the writ of prohibition as moulded, and remands this matter to the circuit court for further proceedings consistent with this opinion. The mandate of this Court shall issue contemporaneously herewith.

Writ Granted as Moulded.

---

standing to intervene due to the fact that they were "former" foster parents on the date that the motion to intervene was actually considered by the circuit court. As discussed, the petitioners filed a motion to intervene on March 26, 2010, in the permanency proceedings on March 29, 2010. They were the physical custodians of D.D. until she was removed from their foster care pursuant to the permanency proceedings on March 29, 2010. The petitioners did have standing to file the motion.