IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2023 Term

_____

No. 22-0365

_____

FILED

June 8, 2023

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE: G.G.

_____

Appeal from the Circuit Court of Raleigh County
Honorable Darl W. Poling, Judge
Civil Action No. 20-JA-73-P

AFFIRMED

_____

Submitted: April 26, 2023
Filed: June 8, 2023

Joseph H. Spano, Jr., Esq.
Pritt & Spano, PLLC
Charleston, West Virginia
Attorney for Petitioners,
      S.M and A.M.


Robert P. Dunlap, II, Esq.
Dunlap and Associates, PLLC
Beckley, West Virginia
Attorney for Intervenors,
      J.M. and A.M.

Patrick Morrisey, Esq.
Attorney General
Brittany Ryers-Hindbaugh, Esq.
Assistant Attorney General
Charleston, West Virginia
Attorneys for WV DHHR


Amber R. Hinkle, Esq.
Taylor & Hinkle
Beckley, West Virginia
Guardian ad Litem

JUSTICE HUTCHISON delivered the Opinion of the Court.
JUSTICES WOOTON and BUNN concur and reserve the right to file concurring opinions.

**SYLLABUS BY THE COURT**

1.      "'This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*.' Syl. Pt. 4, *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996)." Syl. Pt. 1, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005).

2.      "Questions relating to . . . custody of the children are within the sound discretion of the court . . . its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused." Syl., in part, *Nichols v. Nichols*, 160 W. Va. 514, 236 S.E.2d 36 (1977).

3.      "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.,* 194 W. Va. 138, 459 S.E.2d 415 (1995).

4.      "Only two statutory familial preferences applicable to the adoption of a child are recognized in this State: (1) a preference for adoptive placement with the child's grandparents set forth in W. Va. Code § 49-4-114(a)(3) (2015) and (2) a preference for placing siblings into the same adoptive home pursuant to W. Va. Code § 49-4-111 (2015). Apart from the grandparent and the sibling preferences, there does not exist an adoptive

i

placement preference for a child's blood relatives, generally." Syl. Pt. 2, *In re K.L. and R.L.,* 241 W. Va. 546, 826 S.E.2d 671 (2019).

5. West Virginia Code § 49-2-126(a)(5) (2020) requires a circuit court to conduct a best-interest-of-the-child analysis before removing a foster child from his or her foster family home and placing that child in a kinship placement.

6. As written, West Virginia Code § 49-2-126(a)(5) (2020) simply provides a right to a foster child, not an adoptive placement preference for the child's relatives.

7. "The best interests of a child are served by preserving important relationships in that child's life." Syl. Pt. 2, *State ex rel. Treadway v. McCoy*, 189 W. Va. 210, 429 S.E.2d 492 (1993).

8. "[T]he primary goal in cases involving abuse and neglect . . . must be the health and welfare of the children." Syl. Pt. 3, in part, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996).

9. "[I]n a contest involving the custody of an infant where there is no biological parent involved, the best interests of the child are the polar star by which the

discretion of the court will be guided." Syl. Pt. 1, in part, *State ex rel. Treadway v. McCoy*, 189 W. Va. 210, 429 S.E.2d 492 (1993).

**HUTCHISON, Justice:**

The petitioners, S.M.[1] and A.M., appeal the April 11, 2022, order of the Circuit Court of Raleigh County denying their motion to intervene in this abuse and neglect case involving their niece, G.G. The petitioners filed their motion after the parental rights of G.G.'s biological parents were terminated, seeking to intervene at the permanency stage of the proceedings below and, ultimately, adopt G.G. In denying the petitioners' motion, the circuit court found that it was in G.G.'s best interests to be adopted by the respondents, J.M. and A.M.,[2] who have been her foster parents since July 1, 2021. In this appeal, the petitioners contend that the circuit court erred in its finding. They argue that the Foster Child Bill of Rights, codified at West Virginia Code § 49-2-126 (2020), provides a preference for G.G. to be placed with her blood relatives and that because they were found to be a fit and suitable placement, they should have been allowed to adopt G.G. Upon consideration of the parties' briefs and oral arguments, the submitted appendix records, and the pertinent authorities, we find no error and, therefore, affirm the circuit court's decision.

---

[1] In cases involving sensitive facts, we use initials to identify the parties. *See* W. Va. R. App. Proc. 40(e); *see also State v. Edward Charles L.*, 183 W. Va. 461, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

[2] Because G.G.'s aunt and her foster mother have the same initials, we refer to the parties as the petitioners and the respondents rather than using their initials.

## I. Facts and Procedural Background

In May of 2019, approximately one year before G.G. was born, the West Virginia Department of Health and Human Resources ("DHHR") instituted an abuse and neglect proceeding against G.G.'s mother alleging that she had failed to supervise her other two children, A.R. and M.R., and was not providing them with adequate food and housing. There was also an allegation of drug activity in the home. G.G. mother's stipulated to the allegations in the abuse and neglect petition, and at the time of G.G.'s birth, she had been granted a post-adjudicatory improvement period. Upon admission to the hospital to give birth, G.G.'s mother tested positive for heroin. Consequently, the DHHR amended the abuse and neglect petition in June 2020 to allege drug use by G.G.'s mother and to add G.G. to the proceedings. The DHHR then placed G.G. with fictive kin.[3]

In April 2021, G.G.'s mother's parental rights to her two older children were terminated,[4] and she was granted a post-adjudicatory improvement period with respect to G.G. On July 1, 2021, the DHHR removed G.G. from the custody of her fictive kin and placed her with the respondents. While the record is unclear as to exactly why G.G. was

---

[3] The fictive kin are not clearly identified in the record, but they appear to have been family friends. *See* W. Va. Code § 49-1-206 (2021) (defining "fictive kin" as "an adult of at least 21 years of age, who is not a relative of the child, as defined herein, but who has an established, substantial relationship with the child").

[4] At that juncture, the two older children had been in the legal custody of the DHHR for fifteen of the last twenty-two months, and the circuit court found that it was in their best interests to terminate their mother's parental rights.

removed from her initial placement, it appears to have been due to a housing issue. Thereafter, G.G.'s biological father voluntarily relinquished his parental rights, and G.G.'s mother's parental rights were involuntarily terminated at a final dispositional hearing in September 2021.[5]

On November 1, 2021, the respondents filed a motion to intervene in the abuse and neglect proceedings, seeking to adopt G.G. Ten days later, the petitioners filed their motion to intervene, also seeking permanent placement of G.G. Because the petitioners reside in Georgia, the DHHR was required to initiate a home study pursuant to the Interstate Compact on the Placement of Children ("ICPC"). *See* W. Va. Code §§ 49-7-101 & 102 (2015). While that process was ongoing, the DHHR arranged for the petitioners to have video calls with G.G. The petitioners were also afforded three in-person visits with G.G. prior to the hearing on the motions to intervene.

The circuit court held the hearing on the parties' motions to intervene over the course of two days in March 2022. Both the petitioners and the respondents called multiple witnesses to testify, and the DHHR presented testimony as well. On April 11, 2022, the circuit court issued its ruling denying the petitioners' motion to intervene and

---

[5] G.G.'s mother appealed the termination of her parental rights to this Court, and we upheld the circuit court's order by memorandum decision entered on April 14, 2022. *See In re G.G.,* No. 21-0774, 2022 WL 1115826 (W. Va. Apr. 14, 2022) (memorandum decision).

granting the motion filed by the respondents. The circuit court found that both the petitioners and the respondents were able to provide a suitable and fit placement for G.G. and noted that both had indicated a willingness to accept placement of her older siblings.[6] The circuit court further found, however, that the determinative factor was G.G.'s best interests and that, given the amount of time she had resided with the respondents and the significant attachments that undoubtedly had been established, she should remain in that placement. Upon entry of the circuit court's order, this appeal followed.

## II. Standard of Review

We recently adopted a standard of review for appeals concerning the denial of motions for permissive intervention in child abuse and neglect proceedings. *See* Syl. Pt. 1, *In re H.W.*, 247 W. Va. 109, 875 S.E.2d 247 (2022). Although the petitioners in this case are appealing the denial of their motion to intervene, the procedural posture of this case differs vastly from *In re H.W.* In this case, the circuit court held a full evidentiary hearing after the petitioners and the respondents filed their motions to intervene and then issued an order that not only denied the petitioners' motion, but also determined G.G.'s permanent placement. While the circuit court did not grant the petitioners' motion to intervene, it allowed them to fully participate in the hearing to the same extent it permitted the respondents, whose motion to intervene was ultimately granted. Accordingly, "'[t]his

---

[6] The record indicates that abuse and neglect proceedings were instituted again regarding G.G.'s siblings. Those proceedings are separate from this case.

4

Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*.' Syl. Pt. 4, *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996)." Syl. Pt. 1, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005). Because "[q]uestions relating to . . . custody of the children are within the sound discretion of the court . . . its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused." Syl., in part, *Nichols v. Nichols*, 160 W. Va. 514, 236 S.E.2d 36 (1977). Finally, we apply the de novo standard of review to our examination of West Virginia Code § 49-2-126. As we have held, "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.,* 194 W. Va. 138, 459 S.E.2d 415 (1995). With these standards in mind, we proceed to review the circuit's court decision.

## III. Discussion

In this appeal, the petitioners argue that the circuit court's decision to allow the respondents to intervene and, ultimately, adopt G.G. is contrary to a clearly established preference for relative placement set forth in the Foster Child Bill of Rights. In particular, the petitioners rely on West Virginia Code § 49-2-126(a)(5) which provides that foster children have "[t]he right to be placed in a kinship placement, when such placement meets the objectives set forth in this article." The petitioners contend that because the circuit court found that they were a fit and proper placement for G.G. and were willing to accept

5

placement of her siblings, they, as G.G.'s maternal aunt and uncle, should have been allowed to intervene and ultimately adopt G.G. in accordance with the kinship placement right afforded by the Foster Child Bill of Rights.

The petitioners maintain that the circuit court erred when it concluded that "the determinative factor in this action is that G.G. has been placed with the foster parents for a period of nine (9) months . . . [and] significant attachments have undoubtedly been established with the foster parents, their household, routines, and parenting during this time." Relying upon West Virginia Code § 49-4-111(b)(3) (2015),[7] they assert that it is only when a child has been with a foster family for more than eighteen months that a court must consider the child's best interests when determining whether to terminate the foster care arrangement. In addition, the petitioners argue that the circuit court court's conclusion that significant attachments between G.G. and the respondents had been established is simply "not true." In that regard, they contend, without any citing any authority other than

_____

[7] West Virginia Code § 49-4-111(b) provides, in pertinent part:

> When a child has been placed in a foster care arrangement for a period in excess of eighteen consecutive months, and the department determines that the placement is a fit and proper place for the child to reside, the foster care arrangement may not be terminated unless the termination is in the best interest of the child and:
>
> * * * *
>
> (3) The foster care arrangement is terminated due to the child being united or reunited with a sibling or siblings[.]

6

what they say is "commonsense," that "[n]o child remembers anything before the age of two and in most cases three or four years of age" and "no child would remember being separated from a foster parent at that age." Finally, the petitioners argue that they should not be penalized because of the delay resulting from the ICPC process and continuances issued by the circuit court that caused G.G. to be in the custody of the respondents for eight months prior to the hearing on the motions to intervene, noting that they attempted to obtain placement of G.G. at the outset of the proceedings below.

We begin our analysis by considering the petitioners' argument that there is an adoptive placement preference for a child's blood relatives. This Court first rejected that argument in *Kristopher O. v. Mazzone,* 227 W. Va. 184, 706 S.E.2d 381 (2011). In that case, a child had been removed from her foster parents with whom she had resided for twenty-two consecutive months and placed with her paternal aunt. *Id.* at 188, 706 S.E.2d at 385. The decision was based on the DHHR's internal policy at the time that provided a preference for relatives for adoptive placement even if a non-relative home appeared to be a better placement choice. *Id.* at 192, 706 S.E.2d at 389. The DHHR maintained that the policy was necessary to comply with federal funding guidelines. *Id.* Upon review, this Court determined that "compliance with federal law does not require that a child be placed with a blood relative, it only requires that such placement be considered" and that "the only statutory preference within our laws regarding the adoption of a child involves grandparents and reunification of siblings." *Id.* at 193, 706 S.E.2d at 390. Accordingly,

the circuit court's decision was reversed, and the case was remanded for a new permanency hearing.

We reiterated our finding that there is no adoptive placement preference for blood relatives more recently in *In re K.L. and R.L.*, 241 W. Va. 546, 826 S.E.2d 671 (2019). In that case, the circuit court had awarded custody of two children to a paternal aunt and uncle finding them to be "the preferred placement because they are the children's 'blood relatives.'" *Id.* at 551, 826 S.E.2d at 676. Upon review, we flatly rejected the circuit court's finding and reversed the decision, echoing our determination in *Kristopher O.* "that no preference is afforded to blood relatives, generally, when placing a child for adoption." *Id.* at 556, 826 S.E.2d at 681. Indeed, we specifically held:

> Only two statutory familial preferences applicable to the adoption of a child are recognized in this State: (1) a preference for adoptive placement with the child's grandparents set forth in W. Va. Code § 49-4-114(a)(3) (2015) and (2) a preference for placing siblings into the same adoptive home pursuant to W. Va. Code § 49-4-111 (2015). Apart from the grandparent and the sibling preferences, there does not exist an adoptive placement preference for a child's blood relatives, generally.

*In re K.L.,* 241 W.Va. at 547, 826 S.E.2d at 672, syl. pt. 2.

We realize, of course, that *Kristopher O.* and *In re K.L.* were decided before the Foster Child Bill of Rights was enacted. In 2020, the Legislature rewrote West Virginia Code § 49-2-126 and reenacted it as the Foster Child Bill of Rights. This statute now recognizes that "[f]oster children and children in a kinship placement are active and

8

participating members of the child welfare system" and affords them certain enumerated rights. W. Va. Code § 49-2-126(a). One of those rights is "the right to be placed in a kinship placement." W. Va. Code § 49-2-126(a)(5). This subsection further states, however, that the right is only provided "when such placement meets the objectives set forth in this article." *Id.* And, as we determined in *In re R.S.*, 244 W. Va. 564, 572, 855 S.E.2d 355, 363 (2021), this means "the statute requires consideration of the child's 'needs' or best interest" in accordance with pre-existing statutory law and the significant body of case law of this Court concerning abuse and neglect proceedings. *Id.*

*In re R.S.* presented the first opportunity for this Court to examine the Foster Child Bill of Rights. In that case, our focus was on West Virginia Code § 49-2-126(a)(6), which provides a child

> the right, when placed with a foster of [sic] kinship family to be matched as closely as possible with a family meeting the child's needs, including when possible, the ability to remain with siblings.

That provision was at issue because R.S., the youngest of five children who were removed from their biological parents due to allegations of abuse and neglect, had been placed in a foster home separate from his siblings. *In re R.S.,* 244 W. Va. at 567, 855 S.E.2d at 358. Following a timeline similar to the case at bar, R.S. was placed with his foster parents in July of 2019, and his biological parents' parental rights were terminated in December 2019. Approximately three months later, R.S.'s foster parents filed a motion to intervene, seeking to adopt R.S. *Id.* at 568, 855 S.E.2d at 359. At a review hearing the next month, the DHHR

9

advised the circuit court that it had located another foster family that would accept placement of all five siblings. That family's home study was approved, and R.S.'s siblings were placed with them. *Id.* R.S. was not immediately placed with this new foster family, however, because his current foster parents asserted that he had developed a secure attachment to them, and they requested that the circuit court order an expert assessment to examine the risks of removing R.S. from their care. The circuit court granted the request, ordered an expert bonding assessment, and scheduled a full evidentiary hearing regarding R.S.'s permanent placement that was to be held after the assessment was completed. *Id.* However, before the assessment report was submitted, the circuit court issued another order requiring R.S. to be immediately removed from his current foster family and permanently placed with his siblings to comply with the newly enacted Foster Child Bill of Rights. In its order, the circuit court concluded that "under this new legislation it had no authority to consider R.S.'s best interests over the child's right to be placed with his siblings." *Id.* R.S.'s foster parents appealed the decision, and we undertook an examination of the effect of the Foster Child Bill of Rights on R.S.' s placement.

Utilizing our rules of statutory construction, we first observed in *In re R.S.* that the Foster Child Bill of Rights "does not include any mandatory language, such as the word 'shall' or 'must.'" 244 W. Va. at 571, 655 S.E.2d at 362. With no evidence of legislative intent to give mandatory direction, we found that "W. Va. Code § 49-2-126(a)(6) directs that a child's ability to remain with siblings is to be *included* as a factor when making a permanent placement ruling." *Id.* Continuing to apply the statute as written

10

as we are required to do,[8] we then determined that the language "'to be matched as closely as possibly *with a family meeting the child's needs*' requires a circuit court to conduct an analysis of 1) the child's needs, and 2) the family's ability to meet those needs." *In re R.S.,* 244 W. Va. at 571, 855 S.E.2d at 362. In other words, the court "must consider whether placement with a particular family meets the child's needs, an analysis that is generally synonymous with consideration of what is in the child's best interests." *Id.*

We found in *In re R.S.* that not only was the circuit court's ruling not supported by the plain language of the statute, but the decision conflicted with our pre-existing statutory and case law addressing the sibling preference. *Id.* Specifically, we found that the circuit court's conclusion that the Foster Child Bill of Rights mandated that R.S. be placed with siblings was completely contrary to West Virginia Code § 49-4-111(e), which does provide a sibling placement preference but also requires a determination that reunification of siblings is in the best interests of all the children. *Id.* In addition to the statutory requirement to consider the children's best interests, we found that the circuit court's decision was "in direct opposition to well-established caselaw from this Court in which we have held that 'the best interests of the child is the polar star by which decisions must be made which affect children.'" 244 W. Va. at 573, 855 S.E.2d at 364, quoting

---

[8] *See* Syl. Pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951) ("A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.").

*Michael K.T. v. Tina L.T.*, 182 W. Va. 399, 405, 387 S.E.2d 866, 872 (1989).  Accordingly,

we held in syllabus point eleven of *In re R.S.* that

> W. Va. Code § 49-2-126(a)(6) (2020) requires a circuit
> court to conduct a best interest of the child analysis by
> considering a child's needs, and a family's ability to meet those
> needs. One factor that may be included in this analysis is a
> child's ability to remain with his or her siblings. A circuit court
> considering this factor should conduct its analysis in
> conformity with W. Va. Code § 49-4-111(e) (2015).

244 W. Va. at 566, 855 S.E.2d at 357.

Our analysis in *In re R.S.* with respect to subsection (a)(6) of West Virginia

Code § 49-2-126 is equally applicable to subsection (a)(5).  Like subsection (a)(6), West

Virginia Code § 49-2-126(a)(5) contains qualifying language that directs that a child's

placement in a kinship home should only occur "when such placement meets the objectives

set forth in this article."   This article, which addresses the State's responsibilities for

children, is part of Chapter 49, which has the stated purpose of providing a system of child

welfare services to assure that "appropriate care is given and maintained" for children who

become participating members of this system.  W. Va. Code § 49-1-105 (2015). To achieve

that purpose, the child's best interests must be considered.  Indeed, we have made clear

that *"regardless of whether there exists a placement preference that applies to the facts of*

*th[e] case, any preference always is tempered by a consideration of the children's best*

*interests."  In re R.S.,* 244 W. Va. at 573-74, 855 S.E.2d at 364-65 (citation omitted).

Stated another way, "*if allegiance to a preferential placement does not promote the*

*children's best interests, such preference must yield to the placement that is most beneficial*

*to the children.*" *Id.* (citation omitted); *see also In re Elizabeth F.*, 225 W. Va. 780, 786-87, 696 S.E.2d 296, 302-303 (2010) (explaining that "an integral part of implementation of the grandparent preference, as with all decisions concerning minor children, is the best interest of the child"). Accordingly, we now hold that West Virginia Code § 49-2-126(a)(5) requires a circuit court to conduct a best-interest-of-the-child analysis before removing a foster child from his or her foster family home and placing that child in a kinship placement. Applying our new holding to this case, we find that the circuit court did not err in considering G.G.'s best interests in ruling upon the parties' motions to intervene.[9]

We wish to make clear that our holding today should not be construed to mean that we have found that West Virginia Code § 49-2-126(a)(5) provides an adoptive placement preference for a child's blood relatives generally. This subsection does not contain any language to that effect, and accordingly, we decline to declare that such a preference exists. As we have previously explained, "[c]ourts are not free to read into the language what is not there, but rather should apply the statute as written." *State ex rel. Frazier v. Meadows*, 193 W. Va. 20, 24, 454 S.E.2d 65, 69 (1994). Notably, when

---

[9] The petitioners' reliance upon West Virginia Code § 49-4-111(b)(3) was misplaced. As we made clear above, any decision concerning a minor child requires a consideration of the child's best interests. Moreover, this statutory provision has no application in this instance as it pertains to the reunification of a child with a sibling after the child has resided in a separate foster home for a period in excess of eighteen months. *See* n. 7, *supra*. Those are not the circumstances in this case.

13

providing adoptive placement preferences, the Legislature has done so through separate statutory enactments with clear language mandating that those placements be considered prior to any other prospective adoptive placement. *See* § W.Va. Code 49-4-114(a)(3) (2015) (providing grandparent preference) and W.Va. Code § 49-4-111 (2015) (providing sibling preference). As written, West Virginia Code § 49-2-126(a)(5) simply provides a right to a foster child, not an adoptive placement preference for the child's relatives.[10]

We now turn to the petitioners' argument that the circuit court erred in its assessment of G.G.'s best interests. In that regard, the petitioners contend that G.G. had not lived with her foster parents long enough to have formed a significant bond and that given that she was just two years old, she would have no memory of being separated from them. Contrary to the petitioners' unsupported assertions, it is well-established that significant bonds are formed between a child and his or her caregivers at this young age, and, critically, any disruption of those bonds has the potential to severely impact the child's growth and development. We have observed:

> As explained in J. Goldstein, A. Freud & J. Solnit,
> *Beyond the Best Interests of the Child* 32–33 (1973),

---

[10] We are mindful that West Virginia Code § 49-4-601a (2020), discussed further herein, does provide a preference for children to be placed with relatives or fictive kin when they are initially removed from the custody of their biological parents. Obviously, when a placement is made with relatives or fictive kin at the removal stage of the proceedings and parental rights are later terminated, that home would be the adoptive placement choice although it would still be subject to a best-interest-of-the-child analysis. However, where a child is not residing in a kinship placement at the permanency stage of the proceedings, West Virginia Code § 49-2-126(a)(5) does not provide an adoptive placement preference for blood relatives.

Continuity of relationships, surroundings and environmental influence are essential for a child's normal development. Since they do not play the same role in later life, their importance is often underrated by the adult world.

Physical, emotional, intellectual, social, and moral growth does not happen without causing the child inevitable internal difficulties. The instability of all mental processes during the period of development needs to be offset by stability and uninterrupted support from external sources. Smooth growth is arrested or disrupted when upheavals and changes in the external world are added to the internal ones.

This is especially true during the first three years of life. Burton L. White, Ph.D., in his book, *The First Three Years of Life* (1985), begins his preface as follows:

After seventeen years of research on how human beings acquire their abilities, I have become convinced that it is to the first three years of life that we should now turn most of our attention. My own studies, as well as the work of many others, have clearly indicated that the experiences of those first years are far more important than we had previously thought. In their simple everyday activities, infants and toddlers form the foundations of all later development.

*Id.* at v.

In the first chapter of her book, *The Critical Years: A Guide for Dedicated Parents* (1984), Doris E. Durrell, Ph.D., explains the following:

Throughout my years of experience in raising children and treating children in a clinical setting, I have been continually impressed with the degree to which personality has been formed by the time a child is three years old. By this time, certain positive behaviors will have been established which will continue to bring your child positive responses, or negative behaviors may be

15

established which will cause your child problems with peers and adults.

*Id.* at 9.

*In re Carlita B.*, 185 W. Va. 613, 623, 408 S.E.2d 365, 375 (1991).

Recognizing that "'continuity of relationships, surroundings and environmental influence' during a child's first three years of life" is vitally important,[11] this Court has "developed a policy that stable relationships should be preserved whenever feasible." *State ex rel. Treadway v. McCoy*, 189 W. Va. 210, 213, 429 S.E.2d 492, 495 (1993). In fact, we have specifically held that "[t]he best interests of a child are served by preserving important relationships in that child's life." *Id.* at 210, 429 S.E.2d at 492, syl. pt. 2; *see also* Syl. Pt. 11, *In re Jonathan G.*, 198 W. Va. 716, 482 S.E.2d 893 (1996) ("A child has a right to continued association with individuals with whom he has formed a close emotional bond, including foster parents, provided that a determination is made that such continued contact is in the best interests of the child."). Accordingly, "in cases where a child has been in one home for a substantial period, '[h]is environment and sense of security should not be disturbed without a clear showing of significant benefit to him.'" *In re Brandon*, 183 W. Va. 113, 121, 394 S.E.2d 515, 523 (1990), quoting *Lemley v. Barr*, 176 W. Va. 378, 386, 343 S.E.2d 101, 110 (1986) (internal quotations and citations omitted)).

---

[11] *In re K.E. & K.E.*, 240 W. Va. 220, 227, 809 S.E.2d 531, 538 (2018) (additional citation omitted).

16

In this case, the circuit court found that G.G. had resided with the respondents for almost half of her life, which was during "one of the most formative points in a young life." The circuit court further found that "G.G. ha[d] become accustomed to the home and family providing for her care during [this] extended period of her life" and that "significant attachments undoubtedly have been established with the [respondents], their household, routines, and parenting during this time." Although both the petitioners and the respondents were determined to be fit, able, and willing to accept placement of G.G., the circuit court concluded that the bonds and attachments that had been established between G.G. and the respondents were determinative of G.G.'s best interests. Thus, the circuit court decided that G.G. should remain in her current placement with the respondents.

Having carefully reviewed the record, we find that the evidence presented during the hearing below supports the circuit court's decision. In that regard, there was evidence indicating that G.G. referred to the respondents as "Mommy" and "Daddy" and viewed them as her parents. The treatment coordinator, who was responsible for overseeing G.G.'s placement with the respondents, testified that she had been in the foster home biweekly and that having observed G.G. interact with the respondents for more than six months, she believed G.G. had developed an "extreme bond" with them. Elaborating, she testified,

> And what I mean by "extreme bond" is she is a very happy-go-lucky little girl. Whenever they are not there or if they use the bathroom or walk out to the garage to let the dog in, she instantly changes and, in my professional opinion, that is an extreme bond.

17

In addition, the guardian ad litem submitted a comprehensive report in which she concluded that "moving G.G. at this time would be contrary to her best interests." She recommended a permanency plan for G.G. to be adopted by the respondents. Given this evidence, we are unable to find that the circuit court abused its discretion in its assessment of G.G.'s best interests.

As a final matter, we consider the petitioners' argument that it was the delay caused by the ICPC process that prevented them from obtaining custody of their niece. They contend that had the DHHR complied with West Virginia Code § 49-4-601a (2020) at the outset of this case, they would have been able to adopt G.G. West Virginia Code § 49-4-601a provides, in pertinent part:

> When a child is removed from his or her home, placement preference is to be given to relatives or fictive kin of the child. If a child requires out-of-home care, placement of a child with a relative is the least restrictive alternative living arrangement. The department must diligently search for relatives of the child and fictive kin within the first days of a child's removal and must identify and provide notice of the child's need for a placement to relatives and fictive kin who are willing to act as a foster or kinship parent.

West Virginia Code § 49-4-601a was a newly enacted statute in June 2020, and it is unclear from the record before us as to whether it had become effective at the time G.G. was removed from her biological mother's custody. Regardless of when the statute became applicable though, the record shows that the DHHR complied with its provisions.

As discussed above, G.G. was initially placed with fictive kin, where she resided for several months.

The record further indicates that G.G.'s initial placement was made based on information provided by her biological mother and that she never advised the DHHR that she had a sister living in another state.[12] Nonetheless, the petitioners maintain that they independently contacted the DHHR when G.G. was removed from her biological mother's custody and inquired about being a placement for G.G. Yet, G.G.'s DHHR caseworker testified that he never received such a call and that he believed that any initial inquiry made by the petitioners may have occurred a year earlier when G.G.'s siblings were removed from their mother's home. While there is disagreement as to when the petitioners first sought to obtain custody of G.G., we need not dwell on these disputed facts. "Regardless of who is responsible for the delay in this case, the child is the unfortunate victim." *Department of Human Services v. La Rea Ann C.L.,* 175 W. Va. 330, 337 n.8, 332 S.E.2d 632, 638 n.8 (1985).

Irrespective of when the DHHR was informed that the petitioners wished to obtain custody of G.G., the fact remains that G.G. was placed in the respondents' home, and she resided there for nine months before this matter was decided by the circuit court.

---

[12] It appears from the record that the relationship between G.G.'s mother and her sister had deteriorated during the time that the abuse and neglect proceedings occurred below.

The decision regarding G.G.'s permanent placement had to be made based upon the circumstances existing at that time, not when the petitioners contend that they first sought custody of G.G. While we understand the petitioners' desire to obtain custody of their niece and be a part of her life, bureaucratic errors and delays cannot dictate the outcome of a case where a child's future is at stake. As we have long held, "the primary goal in cases involving abuse and neglect . . . must be the health and welfare of the children." Syl. Pt. 3, in part, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996). Therefore, as discussed above, "in a contest involving the custody of an infant where there is no biological parent involved, the best interests of the child are the polar star by which the discretion of the court will be guided." *McCoy*, 189 W. Va. at 210, 429 S.E.2d at 492, syl. pt. 1, in part. Here, the circuit court determined that it is in G.G.'s best interests to remain in her current placement with the respondents, and we have found no basis to set aside that determination.

## IV. Conclusion

Accordingly, for the foregoing reasons, the circuit court's April 11, 2022, order is affirmed.

Affirmed.