**IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA**

**January 2019 Term**

_____

No. 18-0500

_____

**FILED**

**April 4, 2019**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*IN RE* K.L. AND R.L.

_____

**Appeal from the Circuit Court of Randolph County**
**The Honorable David H. Wilmoth, Judge**
**Civil Action Nos. 17-JA-26 and 17-JA-27**

**REVERSED AND REMANDED**

_____

**Submitted:  January 16, 2019**
**Filed:  April 4, 2019**

Heather M. Weese
Law Office of Heather M. Weese, PLLC
Elkins, West Virginia
Guardian ad Litem for the Petitioners,
Minor Children, K.L. and R.L.


J. Brent Easton
Brent Easton Attorney at Law PLLC
Davis, West Virginia
Attorney for the Petitioners,
Foster Parents, R.C. and B.C.

Debra V. Chafin
Larry W. Chafin
Law Office of Debra V. Chafin, PLLC
Clarksburg, West Virginia
Attorneys for the Respondents,
Paternal Uncle and Aunt,
B.L. and J.L.

**Patrick Morrisey**
**Attorney General**
**Charleston, West Virginia**
**Melinda C. Dugas**
**Assistant Attorney General**
**Martinsburg, West Virginia**
**Attorneys for the Petitioner,**
**West Virginia Department of**
**Health and Human Resources**


**JUSTICE JENKINS delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.  "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syllabus point 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

2.  Only two statutory familial preferences applicable to the adoption of a child are recognized in this State: (1) a preference for adoptive placement with the child's grandparents set forth in W. Va. Code § 49-4-114(a)(3) (2015) and (2) a preference for placing siblings into the same adoptive home pursuant to W. Va. Code § 49-4-111 (2015). Apart from the grandparent and the sibling preferences, there does not exist an adoptive placement preference for a child's blood relatives, generally.

i

3. "Once a court exercising proper jurisdiction has made a determination upon sufficient proof that a child has been neglected and his natural parents were so derelict in their duties as to be unfit, the welfare of the infant is the polar star by which the discretion of the court is to be guided in making its award of legal custody." Syllabus point 8, in part, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973).

**Jenkins, Justice:**

The Petitioners herein, the Guardian ad Litem ("Guardian") for the minor children, K.L.[1] and R.L.; the Department of Health and Human Resources ("DHHR"); and the children's foster parents, R.C. and B.C. ("Foster Parents"),[2] appeal from an "Order of Permanent Placement" entered April 30, 2018, by the Circuit Court of Randolph County. By that order, the circuit court awarded custody of the children to their paternal uncle and aunt, B.L. and J.L. ("Uncle and Aunt"). On appeal to this Court, the Petitioners assign error to the circuit court's decision. The Petitioners claim that the circuit court erroneously concluded, as a matter of law, that there exists, in the abuse and neglect context, a relative preference other than the preference afforded to grandparents and siblings and failed to consider the best interests of the children. Upon a review of the parties' arguments, the appendix record, and the pertinent authorities, we reverse the April 30, 2018 "Order of Permanent Placement" of the Randolph County Circuit Court and remand this case for further proceedings consistent with this Opinion. In summary, the only recognized familial preferences in abuse and neglect proceedings are those afforded to the subject child's grandparents and siblings; there is no preference afforded to blood relatives, generally, of a child subject to abuse and neglect proceedings.

---

[1]In cases involving sensitive facts, we refer to the parties by their initials rather than their full names. *See, e.g.*, *In re I.M.K.*, 240 W. Va. 679, 682 n.1, 815 S.E.2d 490, 493 n.1 (2018); *In re S.H.*, 237 W. Va. 626, 628 n.1, 789 S.E.2d 163, 165 n.1 (2016). *See also* W. Va. R. App. P. 40(e) (restricting use of personal identifiers in cases involving children).

[2]Where necessary, the Petitioners also will be referred to collectively as "the Petitioners."

## FACTS AND PROCEDURAL HISTORY

The case *sub judice* began when the DHHR filed an abuse and neglect petition in May 2017 after the youngest child herein, K.L., was alleged to have been abused and/or neglected when he was born drug-exposed.[3] The DHHR filed an emergency petition charging both the children's Mother and the children's Father with abuse and neglect based upon allegations of domestic violence and illegal drug use by both parents. Specifically, the petition alleged that the parents "are unable to care for their children due to substance abuse, domestic violence, lack of appropriate supervision, and unsafe living conditions." The DHHR also sought ratification of the DHHR's assumption of emergency custody of both K.L., who remained in the hospital following his birth as a result of his drug exposure, and R.L., K.L.'s older sister who was approximately five years old, as well as its removal of R.L. from the home. The circuit court authorized the DHHR's assumption of emergency custody by order entered May 4, 2017, and approved the DHHR's actions by order entered May 9, 2017.

Upon her removal from her parents' home, R.L. was placed with the Foster Parents. Following his release from the hospital, K.L. also was placed with the Foster Parents. The Foster Parents previously have cared for numerous foster children, many of

---

[3]At the time of K.L.'s birth, the Mother tested positive for Buprenorphine, Cannabinoids, and Benzodiazepines. K.L. experienced withdrawal symptoms due to the substances in his system at birth; however, which substances are not apparent in the record.

whom have had special needs, and have adopted five children, two of whom still live in the home.

It appears that the DHHR identified the Uncle and Aunt as a possible relative placement for the children when the DHHR assumed their custody, but, because they live in Michigan, nearly fifteen hours away, the DHHR did not consider the Uncle and Aunt as a temporary placement for the children during the pendency of the abuse and neglect proceedings. Rather, because the goal of the abuse and neglect case was the reunification of the children with their parents, the DHHR determined that the Uncle and Aunt lived too far away to be able to facilitate visits between the children and their parents should the parents be granted visitation during the proceedings. The Uncle and the children's Father are brothers and have a strained relationship such that the Uncle and Aunt had never met the children until after the circuit court's permanent placement hearing when the DHHR arranged visits with the Uncle and Aunt. The Uncle and Aunt have several children, three of whom continue to reside in their home, and the Uncle has significant experience caring for his autistic sibling. They expressed interest in caring for R.L. and K.L., either as a temporary or a permanent placement, and traveled to West Virginia to attend the parents' adjudicatory hearing in the summer of 2017; however, the Uncle and Aunt were not permitted to participate in the hearing because it was closed. There is also some indication that the Father objected to their presence at the hearing.

When she arrived at the Foster Parents' home, R.L. exhibited significant developmental, social, emotional, and educational delays, although she was almost five years old. As recounted by the children's foster care providers, DHHR case worker, and Foster Parents, R.L. could not communicate verbally; could not feed, clothe, or bathe herself; shied away from human contact; and spent most of her time rolled into a ball in the corner of a room moaning, whining, and squealing. Alternate diagnostic theories for R.L.'s conduct ranged from extreme neglect to autism or some other unspecified neurological disorder.

K.L. remained in the hospital for approximately one month after his birth as a result of his withdrawal from the substances to which he was exposed in utero. When K.L. arrived at the Foster Parents' home, he was underweight and continued to receive therapeutic services to overcome the effects of his prenatal drug exposure.

At the conclusion of the adjudicatory hearing, the circuit court granted both parents visitation with the children pending clean drug screens. However, neither parent participated in services, submitted to drug screens, or exercised visitation with their children. Moreover, both parents' attendance at the underlying abuse and neglect hearings was sporadic. Consequently, the circuit court held their dispositional hearing in October 2017, and, by order entered November 3, 2017, terminated both parents' parental rights to R.L. and K.L.

4

During this time, the DHHR caseworker assigned to this matter began completing the paperwork required by the Interstate Compact for the Placement of Children ("ICPC")[4] that was necessary for the Uncle and Aunt to be considered as an adoptive placement for R.L. and K.L. The DHHR submitted the home study request to the State of Michigan shortly after the circuit court entered its dispositional order terminating the parents' parental rights. In January 2018, the DHHR received the Michigan home study report approving the Uncle and Aunt as an adoptive placement for the children.

While the abuse and neglect case was proceeding, R.L. received numerous therapeutic services—private speech therapy paid for by the Foster Parents; in-home services provided by the Foster Parents; and speech, occupational, and developmental therapy provided through the Preston County, West Virginia, public school system. By the time of the circuit court's permanent placement hearing in March 2018, R.L. was attending public school kindergarten; feeding, dressing, and bathing herself with assistance; interacting with people and showing affection; and speaking with a vocabulary of approximately fifty words. Although she continued to have significant delays as compared

---

[4]The Interstate Compact for the Placement of Children ("ICPC") governs the interstate placement of children, including adoptive placements, to ensure that children will be living in safe and suitable homes. *See generally* W. Va. Code §§ 49-7-101 to -304 (LexisNexis 2015).

5

to her peers,[5] R.L. made great strides while living with the Foster Parents. Nevertheless, R.L. continued to exhibit severe separation anxiety and an intolerance for change. For instance, when R.L.'s teacher's aide had an extended medical leave of absence, R.L. began acting out in school, having tantrums, and refusing to do classwork. R.L. also experienced, and continues to have, severe separation anxiety when her Foster Mother is not present to pick her up from the school bus when she returns home from school; on these occasions, R.L. cries and screams until she makes herself sick. The Foster Mother testified that she has to leave a video for R.L. every time she is not home when R.L. returns from school or the child is inconsolable and that she had to leave such a video to attend the permanency hearing.

K.L. continued to thrive while living with the Foster Parents such that he was dismissed from West Virginia Birth to Three services at the age of six months because he no longer experienced any developmental delays. The only lingering issue that K.L. continues to face is low weight.

At the permanent placement hearing in the underlying abuse and neglect case, held on March 22, 2018, both the Foster Parents and the Uncle and Aunt appeared to assert

---

[5]For example, while R.L. was communicating with a vocabulary of approximately fifty words, that was significantly less than the roughly 2,500 word vocabulary common for other children her age.

their interest in serving as a permanent placement for R.L. and K.L. and ultimately adopting the children. The DHHR and the Guardian also participated in the hearing and recommended that the children's best interests would be served by continuing their placement with the Foster Parents. R.L.'s separation anxiety and inability to tolerate change was so severe that the DHHR and the Guardian felt that placement with the Uncle and Aunt, with whom the children had no relationship and who they had never met, would cause R.L. to regress to the point she may not be able to regain the developmental progress she had made while in the Foster Parents' care.

By "Order of Permanent Placement" entered April 30, 2018, the circuit court awarded the Uncle and Aunt custody of R.L. and K.L. finding them to be the preferred placement because they are the children's "blood relatives." In so ruling, the circuit court determined as follows:

> Pursuant to the provisions of *W. Va. Code* § 49-6-604, following a termination of parental rights, this Court must determine whether the children should be considered for permanent placement with a fit and willing relative.
>
> Pursuant to the provisions of *W. Va. Code* § 49-6-608, following a termination of parental rights, this Court must identify reasons for appropriate disposition, including whether the children should be placed in a relative's home that is fit and willing to provide appropriate care and supervision.
>
> It is the policy of DHHR to place children with relatives, rather than non-relatives, whenever possible.
>
> . . . .

7

The provisions of *W. Va. Code* § 49-4-302 require DHHR to notify and afford to the nearest blood relative the opportunity to take custody of children removed from their parents.

. . . .

It is both the policy of DHHR and the law of this state that a relative placement is preferred to a non-relative foster placement.

It is the law of this state that the best interests of the children be considered when permanency is determined. In light of the statutory provisions regarding placement of children, and decisions of the West Virginia Supreme Court of Appeals, the best interests of the children include considerations of being united with relatives for permanency to afford them the opportunity to develop those family relationships as they grow and mature.

. . . .

To deny the recognized preference of family placement as a result of policy, statutory provisions, and state inaction is contrary to the best interests of the children. . . .

The court further ordered that the children be transitioned to their Uncle and Aunt's custody within ninety days.

Following entry of the circuit court's order, the Guardian moved for a stay thereof pending an appeal to this Court. The circuit court refused to stay transition of the children from the Foster Parents to their Uncle and Aunt. Thereafter, the Petitioners filed the instant appeal from the circuit court's "Order of Permanent Placement" and requested this Court to stay the transfer of custody. By order entered June 18, 2018, we granted the stay.

8

In the meantime, the parties arranged for the children to meet their Uncle and Aunt for visitations to facilitate the children's transition to their Uncle and Aunt's home. Because the Uncle and Aunt live approximately fifteen hours away, they rented an apartment close to the Foster Parent's home so that they could visit more frequently with the children. After a period of weekly visits between R.L., K.L., and their Uncle and Aunt, however, R.L.'s psychologist recommended the visits occur less often due to R.L.'s reactions thereto, which included wetting herself, acting out, and fear and apprehension when going to locations after she had visited with her Uncle and Aunt in those places but at times when no visit was scheduled to occur there. R.L. also underwent additional psychological and diagnostic testing through which it was determined that she is not autistic but that she does experience intellectual challenges.

Through the parties' Rule 11 updates,[6] it appears that K.L. has continued to thrive in the Foster Parents' care. R.L. has continued to receive therapy services and attend public school, and is also participating in recreation league sports. Visits between the children and their Uncle and Aunt continued through the summer of 2018 and into September 2018. Thereafter, the Uncle and Aunt stated that they were unable to travel to

_____

[6]Rule 11 of the West Virginia Rules of Appellate Procedure requires the parties in appeals from abuse and neglect proceedings to provide an update regarding the subject child's current status. *See* W. Va. R. App. P. 11(j) ("The parties shall provide a written statement of any change in the circumstances that were set forth in the briefs within one week of any oral argument scheduled by the Court or within such other time as may be specified by order.").

West Virginia to visit with R.L. and K.L. due to their children's school and sports activities and because of the significant expense they already had incurred in obtaining counsel to represent them in these proceedings and renting an apartment to facilitate the summer visitation schedule. Since their last visit with R.L. and K.L. on September 29, 2018, the Uncle and Aunt have not visited with or had any other contact with R.L. and K.L.

It is within this context that we consider the Petitioners' appeal to this Court.

## II.

## STANDARD OF REVIEW

The instant proceeding is before this Court on appeal from the circuit court's final order in an abuse and neglect proceeding. In this context, we previously have held that,

> [a]lthough conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. pt. 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

10

Additionally, given that the pivotal issue herein is whether there exists a preference for relatives in addition to the grandparent and sibling preferences established by the Legislature, we also must consider the propriety of the meaning ascribed to the pertinent statutes by the circuit court. With respect to such matters, we previously have held that "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995). *See also* Syl. pt. 1, *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995) ("Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review."). In view of these standards, we proceed to consider the errors assigned by the Petitioners.

## III.

## DISCUSSION

The case *sub judice* is before the Court because too many families love R.L. and K.L. and want to provide the best possible future for these children who have endured untold abuse and neglect in their young lives. Both the Foster Parents, with whom the children have resided since their removal from their parents' home, and the children's Uncle and Aunt, who are biologically related to the children, have expressed an interest in adopting them. Yet only one placement can prevail due to the preference for placing

11

siblings in the same adoptive home.[7]  In selecting the children's Uncle and Aunt to be their permanent custodians, the circuit court determined there exists a "blood relative" preference in addition to the statutory preferences afforded to siblings and grandparents in abuse and neglect proceedings.  On appeal to this Court, however, the Petitioners challenge this presumption of an additional preference for relatives, generally, as well as the circuit court's conclusion that awarding custody of the children to their Uncle and Aunt is the permanent placement that most effectively promotes the best interests of R.L. and K.L.

Child abuse and neglect proceedings are governed by statute.  *See generally* W. Va. Code §§ 49-4-101 to -610 (LexisNexis 2015 & Supp. 2018).  *See also In re Beth Ann B.*, 204 W. Va. 424, 427, 513 S.E.2d 472, 475 (1998) (referring to "statutory scheme applicable in abuse and neglect proceedings").  As such, our consideration of the law governing the instant matter is guided by our longstanding rules of statutory construction.  In this regard, we must first look to the statutory language at issue.  Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975) ("The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature.").  If the legislative intent is plain, further interpretation is foreclosed, and we must apply, not construe the language employed by the Legislature.  Syl. pt. 2, *Crockett v. Andrews*, 153 W. Va. 714, 172 S.E.2d 384 (1970) ("Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to

---

[7]*See* note 9, *infra*.

12

interpretation."); Syl. pt. 1, *Dunlap v. State Comp. Dir.*, 149 W. Va. 266, 140 S.E.2d 448 (1965) ("Where the language of a statute is plain and unambiguous, there is no basis for application of rules of statutory construction; but courts must apply the statute according to the legislative intent plainly expressed therein."); Syl. pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951) ("A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.").

Although the goal of abuse and neglect proceedings is the reunification of children and their parents,[8] when such an outcome cannot be achieved, as was the case herein, the matter proceeds to disposition under W. Va. Code § 49-4-604 (LexisNexis 2015 & Supp. 2018). Pursuant to W. Va. Code § 49-4-604(b)(6), when the court decides that a parent's parental rights should be terminated because there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and such disposition is "necessary for the welfare of the child," the dispositional alternatives under such circumstances are limited to "commit[ting] the child to the permanent sole custody of the nonabusing parent, if there be one, or, if not, to either the permanent guardianship of the department or a licensed child welfare agency."

---

[8]*See State ex rel. Amy M. v. Kaufman*, 196 W. Va. 251, 470 S.E.2d 205 (1996) (recognizing goal "to facilitate the reunification of families whenever that reunification is in the best interests of the children involved").

In this case, the circuit court, in its November 3, 2017 dispositional order, ordered that, "[b]ased upon necessity for the welfare and best interest of the children, and other findings . . ., the parental rights of [the Mother] and [the Father] are terminated."  As such, there was no "nonabusing parent" to whom the court could award custody of R.L. and K.L.  Thus, the only custodial placement available to the court under W. Va. Code § 49-4-604(b)(6) was to award guardianship of the children to the DHHR, as it did in this case when it further ordered that "the permanent custody of the children is committed to the Department of Health and Human Resources."  No other placement options are statutorily authorized for a disposition under this section, and no mention is made therein of a preference to be afforded to the relatives of the child subject to such proceedings.

Despite this clear statutory language, however, the circuit court nevertheless recognized there to exist a statutory "relative" preference when determining a child's permanent placement in an abuse and neglect proceeding.  Although the child abuse and neglect statutory scheme does recognize two familial placement preferences that would apply to the instant proceedings, namely the sibling preference[9] and the grandparent

---

[9]The sibling preference is set forth in W. Va. Code § 49-4-111 (LexisNexis 2015) and establishes a preference for placing siblings in the same foster care or adoptive placement, if such placement keeping the siblings together serves their best interests.  *See* Syl. pt. 4, *In re Shanee Carol B.*, 209 W. Va. 658, 550 S.E.2d 636 (2001) ("W. Va. Code § 49-2-14(e) (1995) [now W. Va. Code § 49-4-111] provides for a 'sibling preference' wherein the West Virginia Department of Health and Human Resources is to place a child who is in the department's custody with the foster or adoptive parent(s) of the child's sibling or siblings, where the foster or adoptive parents seek the care and custody of the child, and the department determines (1) the fitness of the persons seeking to enter into a foster care or adoption arrangement which would unite or reunite the siblings, and (2)

14

preference,[10] neither of these provisions formed the basis for the circuit court's decision. Rather, in recognizing a relative preference, generally, the circuit court relied upon various statutory provisions that do not apply to the case *sub judice*.

In deciding to place R.L. and K.L. with their Uncle and Aunt, the circuit court repeatedly reiterated a preference for placing children with their "blood relatives" based

placement of the child with his or her siblings is in the best interests of the children. In any proceeding brought by the department to maintain separation of siblings, such separation may be ordered only if the circuit court determines that clear and convincing evidence supports the department's determination. Upon review by the circuit court of the department's determination to unite a child with his or her siblings, such determination shall be disregarded only where the circuit court finds, by clear and convincing evidence, that the persons with whom the department seeks to place the child are unfit or that placement of the child with his or her siblings is not in the best interests of one or all of the children."). *See also* Syl. pt. 4, *James M. v. Maynard*, 185 W. Va. 648, 408 S.E.2d 400 (1991) ("In cases where there is a termination of parental rights, the circuit court should consider whether continued association with siblings in other placements is in the child's best interests, and if such continued association is in such child's best interests, the court should enter an appropriate order to preserve the rights of siblings to continued contact.").

[10]W. Va. Code § 49-4-114(a)(3) (LexisNexis 2015) establishes an adoptive placement preference for grandparents: "For purposes of any placement of a child for adoption by the department, the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child." *See* Syl. pt. 4, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005) ("West Virginia Code § 49-3-1(a) [now W. Va. Code § 49-4-114(a)(3)] provides for grandparent preference in determining adoptive placement for a child where parental rights have been terminated and also incorporates a best interests analysis within that determination by including the requirement that the DHHR find that the grandparents would be suitable adoptive parents prior to granting custody to the grandparents. The statute contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests of the child."). *Accord In re K.E.*, 240 W. Va. 220, 809 S.E.2d 531 (2018) (ruling that grandparent preference must yield to best interests of children); *In re Hunter H.*, 227 W. Va. 699, 715 S.E.2d 397 (2011) (per curiam) (finding that child's best interests prevail over grandparent preference).

both in statutory law and the DHHR's policies. Neither of these sources of authority, though, support the circuit court's decision. First, the circuit court relied upon the dispositional statute, W. Va. Code § 49-4-604, to find support for its conclusion that, "following a termination of parental rights, this Court must determine whether the children should be considered for permanent placement with a fit and willing relative." Although this language does appear in this code section, it is not in the provision governing the disposition of the case made by the circuit court in its November 3, 2017 dispositional order. Rather, the referenced "fit and willing relative" language is used in connection with the preceding dispositional alternative wherein the court,

> [u]pon a finding that the abusing parent or battered parent or parents are presently unwilling or unable to provide adequately for the child's needs, commit[s] the child *temporarily* to the care, custody, and control of the state department, a licensed private child welfare agency, or a suitable person who may be appointed guardian by the court.

W. Va. Code § 49-4-604(b)(5) (emphasis added). In conjunction with this disposition, the court also must "determine under what circumstances the child's commitment to the department are to continue," W. Va. Code § 49-4-604(b)(5)(E), and consider, among other factors, "whether the child should . . . [b]e considered for permanent placement with a fit and willing relative," W. Va. Code § 49-4-604(b)(5)(E)(ii). Insofar as the parental rights of R.L. and K.L.'s parents were terminated and they were placed in the *permanent* guardianship of the DHHR pursuant to W. Va. Code § 49-4-604(b)(6), the dispositional alternatives of W. Va. Code § 49-4-604(b)(5), which concerns placing children *temporarily* with the DHHR, do not apply to the disposition made by the circuit court in its

16

November 3, 2017 dispositional order. Thus, the circuit court's reliance on the provisions of W. Va. Code § 49-4-604, generally, do not support its finding of a relative preference.

The next statute cited by the circuit court as authority for a relative preference also does not apply to the instant proceeding. In support of its ruling, the circuit court also referenced in its "Order of Permanent Placement" W. Va. Code § 49-6-608, a statute that does not exist in the West Virginia Code, and which the parties suggest refers to W. Va. Code § 49-4-608 (LexisNexis 2015) and governs permanency hearings. Pursuant to W. Va. Code § 49-4-608(a),

> [i]f the court finds, pursuant to this article, that the department is not required to make reasonable efforts to preserve the family, then, notwithstanding any other provision, a permanency hearing must be held within thirty days following entry of the court order so finding, and a permanent placement review hearing must be conducted at least once every ninety days thereafter until a permanent placement is achieved.

In the underlying abuse and neglect proceedings, the circuit court held a disposition hearing on October 17, 2017, and entered its order memorializing its rulings on November 3, 2017. Thereafter, the circuit court held a hearing on October 30, 2017, to expedite the completion of paperwork required by the ICPC and a permanent placement review hearing on January 10, 2018. The final permanent placement hearing was held on March 22, 2018, and the court entered its "Order of Permanent Placement" on April 30, 2018. As such, the circuit court, having terminated the parents' parental rights upon a finding that the family could not be preserved because the conditions of abuse and neglect could not be substantially

17

corrected, proceeded to a permanent placement decision in accordance with W. Va. Code § 49-4-608(a), which does not contain the aforementioned "fit and willing relative" language or any requirement that the subject children be placed with a "fit and willing relative."

This "fit and willing relative" language is contained in the following section, however, which governs permanency decisions that have not been completed within twelve months of the DHHR having been awarded custody of the subject children:

> [i]f, twelve months after receipt by the department or its authorized agent of physical care, custody, and control of a child either by a court-ordered placement or by a voluntary agreement, the department has not placed a child in an adoptive home; placed the child with a natural parent, placed the child in legal guardianship, or permanently placed the child with a fit and willing relative, the court shall hold a permanency hearing.

W. Va. Code § 49-4-608(b). This provision does not govern the circuit court's permanent placement of R.L. and K.L., though, because (1) the court permanently placed the children within the first twelve months of terminating their parents' parental rights and entrusting them to the DHHR and (2) the children's permanency plan contemplated adoption and not mere placement with a relative, as evidenced by the circuit court's March 15, 2018 "Order or Permanent Placement Review," which reflected its rulings during the January 10, 2018 permanent placement review hearing, including the court's finding that "the permanency plan for the children is adoption, though the final placement of the children is not yet determined." In this order, the court further found that "the permanency plan of adoption

18

for the child is in the child's best interests," which ruling presumably applies both to R.L. and K.L. insofar as both children are referenced elsewhere in the order. Because there is no requirement that the children be placed with a fit and willing relative if permanency is achieved within the first twelve months of the DHHR's assumption of their permanent guardianship, the circuit court erred by relying on W. Va. Code § 49-4-608 to find that placement of the children with a relative is mandated by statute.

The circuit court additionally referenced W. Va. Code § 49-4-302 (LexisNexis 2015), which authorizes "a family court judge to order custody of a child in emergency situations." Under this section, "family court judges are authorized to order the department to take emergency custody of a child who is in the physical custody of a party to an action or proceeding before the family court" in certain circumstances evincing imminent harm or danger to the child, the child is not subject to an abuse and neglect proceeding before the circuit court, and no reasonable alternatives to removal from the home exist, and to place the child with the "child's closest relative" or "an appropriate relative." W. Va. Code § 49-4-302(a)(1-3), (g)(1). This provision simply does not apply to the facts of the case presently before the Court because the underlying abuse and neglect proceedings were instituted by the DHHR upon their emergency removal of R.L. from the home and their assumption of emergency custody of K.L. upon his release from the hospital and were accompanied by the filing of an abuse and neglect petition in the circuit court. Moreover, the procedural posture of this case has always resided in the Circuit Court of Randolph County, and no proceedings herein have ever been before the family court. As

19

such, by its very terms, W. Va. Code § 49-4-302 does not justify the circuit court's determination that a relative placement preference exists and applies to govern its permanent placement decision regarding R.L. and K.L.

Finally, the circuit court intimates that the DHHR's own policy also supports a conclusion that there exists a preference for relatives when deciding a child's permanent placement. This argument already has been considered by this Court and was squarely rejected. In *Kristopher O. v. Mazzone*, 227 W. Va. 184, 706 S.E.2d 381 (2011) (per curiam), this Court considered an argument whereby the DHHR believed it was required to prefer relatives for adoptive placements in order to comply with federal funding guidelines and had adopted a policy to that effect that categorically preferred adoptions by a child's grandparents or other adult relative "over the non-relative home even if the non-relative home has the appearance of a better placement choice." *Id.* at 192, 706 S.E.2d at 389. Observing that the relevant federal policy merely required a child's relatives be *considered* as an adoptive placement and not that they be presumptively preferred, this Court explicitly stated that "[i]t is clear from our jurisprudence that the only statutory preference within our laws regarding the adoption of a child involves grandparents and reunification of siblings." 227 W. Va. at 193, 706 S.E.2d at 390. The Court, after reviewing case law reiterating the grandparent preference, further explained that "[i]t does not appear . . . that a preference is granted to blood relatives generally." *Id. Accord In re K.E.*, 240 W. Va. 220, 225 n.9, 809 S.E.2d 531, 536 n.9 (2018) ("We have previously observed that West Virginia law does not grant a permanency preference to blood relatives,

20

generally. The grandparent preference is the sole exception to that rule, and, even then, the preference is tempered by considerations of the child's best interests." (citations omitted)). Moreover, directly addressing the DHHR's policy concerns, the Court clarified that "compliance with federal law does not require that a child be placed with a blood relative, it only requires that such placement be considered." *Id.*

Based upon our review of the law governing abuse and neglect proceedings in this State and the authorities relied upon by the circuit court in rendering its rulings, below, we reach the same conclusion as our brethren in the *Kristopher* case and echo that Court's declaration that no preference is afforded to blood relatives, generally, when placing a child for adoption. Accordingly, we now specifically hold that only two statutory familial preferences applicable to the adoption of a child are recognized in this State: (1) a preference for adoptive placement with the child's grandparents set forth in W. Va. Code § 49-4-114(a)(3) (LexisNexis 2015) and (2) a preference for placing siblings into the same adoptive home pursuant to W. Va. Code § 49-4-111 (LexisNexis 2015). Apart from the grandparent and the sibling preferences, there does not exist an adoptive placement preference for a child's blood relatives, generally. Thus, based upon the foregoing authorities, it is clear that the circuit court erred by finding there to exist a blood relative preference in this State and to rely thereon as a basis for placing R.L. and K.L. with their Uncle and Aunt.

In addition to their contention that the circuit court erred by finding there to exist a "blood relative" preference, the Petitioners also argue that the circuit court improperly assessed the best interests of R.L. and K.L. when placing them with their Uncle and Aunt because it concluded that "the best interest of the children include considerations of being united with relatives for permanency." To support their argument that the children's best interests would be promoted by placing them with the Foster Parents and not with their Uncle and Aunt, the Petitioners cite record evidence demonstrating R.L.'s severe separation anxiety and intolerance for change, as well as treatment notes regarding her neurological deficits and significant social, educational, and developmental delays.

The preeminent concern in all cases involving children, be it an abuse and neglect proceeding or a matter of child custody, is the best interests of the children. In this regard, we specifically have held that

> [o]nce a court exercising proper jurisdiction has made a determination upon sufficient proof that a child has been neglected and his natural parents were so derelict in their duties as to be unfit, the welfare of the infant is the polar star by which the discretion of the court is to be guided in making its award of legal custody.

Syl. pt. 8, in part, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973). *See also* Syl. pt. 2, *State ex rel. Lipscomb v. Joplin*, 131 W. Va. 302, 47 S.E.2d 221 (1948) ("In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided."). Moreover, regardless of whether there exists a

22

placement preference that applies to the facts of this case,[11] any preference always is tempered by a consideration of the children's best interests. *See* Syl. pt. 3, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996) ("Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children."). *See also* Syl. pt. 5, in part, *Carter v. Carter*, 196 W. Va. 239, 470 S.E.2d 193 (1996) ("In . . . custody matters, we have traditionally held paramount the best interests of the child."). In other words, if allegiance to a preferential placement does not promote the children's best interests, such preference must yield to the placement that is most beneficial to the children. *See In re Elizabeth F.*, 225 W. Va. 780, 787, 696 S.E.2d 296, 303 (2010) (per curiam) ("[A]doption by a child's grandparents is permitted only if such adoptive placement serves the child's best interests. If, upon a thorough review of the entire record, the circuit court believes that a grandparental adoption is not in the subject child's best interests, it is not obligated to prefer the grandparents over another, alternative placement that does not serve the child's best interests." (citations omitted)). *See also* Syl. pt. 5, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005) ("By specifying in West Virginia Code § 49-3-1(a)(3) [now W. Va. Code § 49-4-114(a)(3)] that the home study must show that the grandparents 'would be suitable adoptive parents,' the Legislature has implicitly included the requirement for an

---

[11]Having found that no blood relative preference exists vis-à-vis adoptive placements, the only other preferences potentially applicable to the case *sub judice* are the grandparent preference, which the parties have not asserted herein, and the sibling preference, which the parties have conceded has been followed by considering adoptive placements for the children that would place them in the same household.

23

analysis by the Department of Health and Human Resources and circuit courts of the best interests of the child, given all circumstances of the case.").

It is apparent from a review of the record in this case that the severe anxiety suffered by R.L. coupled with the regression of her behaviors following her visits with the Uncle and Aunt suggest that the more suitable, and least traumatic, placement to satisfy R.L.'s best interests would be with the Foster Parents. Moreover, the Court is deeply troubled by the virtual abandonment of the children by the Uncle and Aunt who previously fought so vigilantly to attain their custody. While financial constraints and other familial obligations are understandable impediments to more frequent visits with R.L. and K.L., which require a fifteen hour journey, the Uncle and Aunt's lack of *any* contact whatsoever with the children for the past six and one-half months, and counting, causes the Court great concern regarding the Uncle and Aunt's actual commitment to these children, particularly when such lengthy absences and periods of no contact can seem like an eternity to a young child. Furthermore, continued long distance interaction with the children, through cards or letters, phone calls or video chats, or simply email undeniably would be an easy and cost-effective method of maintaining contact and communicating with the children to allay their fears and promote their sense of comfort and security with the Uncle and Aunt. But, alas, the Uncle and Aunt have failed to take even these most basic and simplistic steps to facilitate a relationship with, and demonstrate their commitment to undertaking the custodial responsibility for, R.L. and K.L.—the very same children the Uncle and Aunt claim they want to adopt.

Given R.L.'s fragile emotional state and the tender years of K.L., during which time sudden and abrupt changes in caretakers is discouraged,[12] we simply do not find that removing R.L. and K.L. from the home of the Foster Parents, in which they have flourished, and placing them with relatives, whose present commitment to the children is questionable at best and practically nonexistent at worst, would promote the children's best interests. Rather, we find the best interests of R.L. and K.L. would best be promoted by allowing them to remain in the Foster Parents' home. In the Foster Parents' household, R.L. finds great comfort and security, which has allowed her to overcome many obstacles and to thrive in their care. For K.L., the Foster Parents' home is the only home he has ever known in his short life. Accordingly, we reverse the circuit court's April 30, 2018 "Order of Permanent Placement" placing the children with their Uncle and Aunt and remand this case for entry of an order finding that placement with the Foster Parents promotes the best interests of R.L. and K.L. and permanently placing the children with the Foster Parents.

---

[12]*See* Syl. pt. 3, in part, *James M. v. Maynard*, 185 W. Va. 648, 408 S.E.2d 400 ("It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians.").

25

## IV.

## CONCLUSION

For the foregoing reasons, the April 30, 2018 "Order of Permanent Placement" of the Circuit Court of Randolph County is hereby reversed, and this case is remanded for further proceedings consistent with this Opinion.

Reversed and Remanded.